820 F.2d 480
 MASHPEE TRIBE, et al., Plaintiffs, Appellants,
v.
SECRETARY OF the INTERIOR, et al., Defendants, Appellees.
 No. 86-1615.
 United States Court of Appeals,
First Circuit.
 Argued Feb. 5, 1987.
Decided June 1, 1987.
 
 Robert C. Hahn with whom William A. Hahn, and Hahn & Matkov, Boston, Mass. were on brief, for plaintiffs, appellants.
 Allan van Gestel with whom Celia D. Moore, and Goodwin, Procter & Hoar, Boston, Mass. were on brief, for defendants, appellees, Town of Edgartown, Town of West Tisbury, and Hope G. Ingersoll.
 Thomas R. Kiley, Asst. Atty. Gen., with whom Francis X. Bellotti, Atty. Gen., and Paul R. Matthews, Asst. Atty. Gen., Boston, Mass. were on brief, for state defendants, appellees.
 Jacques B. Gelin, Dept. of Justice, with whom F. Henry Habicht II, Asst. Atty. Gen., Robert S. Mueller, U.S. Atty., Robert J. Klarquist, and Pauline H. Milius, Dept. of Justice, Washington, D.C. were on brief, for federal defendants, appellees.
 Leonard Kopelman, Barbara J. Saint Andre, and Kopelman and Paige, P.C., Boston, Mass. on brief, for defendant, appellee, Town of Plymouth.
 Before BREYER, ALDRICH and SELYA, Circuit Judges.
 BREYER, Circuit Judge.
 
 
 1
 The appellants in this case are Indians who seek declaratory judgments confirming recognition of their tribes and acknowledging the tribes' "Indian title" to certain land in southeastern Massachusetts. "Indian title," also known as "aboriginal title," is the right of Indian tribes to use and occupy "lands they had inhabited from time immemorial." County of Oneida v. Oneida Indian Nation, 470 U.S. 226, 234, 105 S.Ct. 1245, 1251, 84 L.Ed.2d 169 (1985) (Oneida II ). Termination of this title requires consent of the sovereign. See id.; Oneida Indian Nation v. County of Oneida, 414 U.S. 661, 667, 94 S.Ct. 772, 777, 39 L.Ed.2d 73 (1974) (Oneida I ). Appellants claim that they have title to the land in question because the Massachusetts statutes that purported to give their ancestors the power to alienate their property, 1870 Mass.Acts ch. 293, and that transferred some of the disputed land to the Town of Mashpee, 1869 Mass.Acts ch. 463, were invalid. According to appellants, only the federal government could legally authorize Indian tribes to dispose of Indian title to their lands. Because the federal government did not grant appellants' ancestors permission to alienate their land, appellants argue that any conveyances were ineffective; title therefore remained with the Indian tribes the appellants claim to represent (perhaps eventually passing to individual appellants).
 
 
 2
 The dispositive issue on this appeal can be stated simply. Have the appellants shown that the entities whose rights they seek to assert--the Mashpees, Christiantowns, Chappaquiddicks, Herring Ponds, and Troys--were in fact tribes in the late 1860s when the Massachusetts statutes were enacted and (presumably) the relevant ancestors tried to convey title? It is well established that the most important statute the appellants invoke--the Indian Nonintercourse Act, 25 U.S.C. Sec. 177--allows recovery only if plaintiffs show they are or properly represent entities that 1) were tribes at the time the land was alienated and 2) remain tribes at the time of suit. See James v. Watt, 716 F.2d 71, 72 (1st Cir.1983); Epps v. Andrus, 611 F.2d 915 (1st Cir.1979); Mashpee Tribe v. New Seabury Corp., 592 F.2d 575, 581 (1st Cir.1979), cert. denied, 444 U.S. 866, 100 S.Ct. 138, 62 L.Ed.2d 90 (1979); Joint Tribal Council of the Passamaquoddy Tribe v. Morton, 528 F.2d 370, 378 (1st Cir.1975). Alternative legal authority upon which appellants base their claims, namely federal common law and the Indian Commerce Clause, also (at best) protect a tribe 's title to land. See U.S. Const. art. 1, Sec. 8 (empowering Congress to "regulate Commerce ... with the Indian tribes"); Oneida II, supra (permitting a tribe to assert a claim under federal common law); Canadian St. Regis Band of Mohawk Indians v. New York, 573 F.Supp. 1530 (N.D.N.Y.1983) ("To the extent that the individual plaintiffs purport to maintain an ejectment action under federal common law, ... the individual plaintiffs lack standing because they lack title."). Appellants can assert only tribal claims and must therefore show that the allegedly invalid conveyances made sometime subsequent to the 1869 and 1870 statutes were conveyances of title by entities existing as tribes.
 
 
 3
 In an earlier stage of this litigation, the Mashpees tried before a jury the issue of tribal status. See Mashpee Tribe v. New Seabury Corp., 447 F.Supp. 940 (D.Mass.1978) (Mashpee I ), aff'd, 592 F.2d 575 (1st Cir.), cert. denied, 444 U.S. 866, 100 S.Ct. 138, 62 L.Ed.2d 90 (1979). In that case, the district court adopted the definition of "tribe" used in Montoya v. United States, 180 U.S. 261, 21 S.Ct. 358, 45 L.Ed. 521 (1901), and instructed the jury that a "tribe" is a "body of Indians of the same or similar race, united in a community under one leadership or government, and inhabiting a particular though sometimes ill-defined territory." Id. at 266, 21 S.Ct. at 359; see Mashpee I, 592 F.2d at 582. Applying this definition, the jury decided that the Mashpees failed to prove their tribal existence as a matter of fact, and the court dismissed the case.
 
 
 4
 The district court dismissed the present appellants' cases because they also failed to establish their tribal status. In our view, the court's decision was legally correct. It was correct with respect to the Mashpees because their "effort to relitigate the tribe's claim is barred by elementary principles of res judicata." Mashpee Tribe v. Watt, 707 F.2d 23, 24 (1st Cir.), cert. denied, 464 U.S. 1020, 104 S.Ct. 555, 78 L.Ed.2d 728 (1983). It is correct with respect to all five Indian entities for the following reasons.
 
 
 5
 Appellants claim that four nineteenth century documents establish their tribal status. We have printed these documents in an appendix. They include (1) several pages from an appendix to "A Report to the Secretary of War of the United States, On Indian Affairs, Comprising a Narrative of a Tour Performed in the Summer of 1820, Under a Commission from the President of the United States, for the Purpose of Ascertaining the Actual State of the Indian Tribes in our Country," by Rev. J. Morse; (2) a report from Thomas McKenney that is included in the appendix to "Indian Treaties and Laws and Regulations Relating to Indian Affairs" (1826); (3) some statistical tables included in H.R.Rep. No. 474, 23d Cong., 1st Sess. (1834); and (4) a statistical table from Henry Schoolcraft's "Historical and Statistical Information Respecting the History, Condition and Prospects of the Indian Tribes of the United States" (1850). Some or all of these documents refer to Mashpees, Christiantowns, Chappaquiddicks, Herring Ponds, and Troys as "tribes." Appellants have not specifically argued that these documents show tribal status as a matter of fact under the standard of Mashpee I. Appellants argue instead that they show tribal status as a matter of law or through the operation of a principle akin to estoppel. Regardless of the legal lens through which we view these documents, however, we find them inadequate to show tribal status.
 
 
 6
 The initial document, an appendix to the 1820 Report by Reverend Morse, calls the appellant Indian groups "tribes," but it also refers to them as "remnants." It says that in 1820 there were 320 Indians at Marshpee, 40 at Herring Pond, 48 at Troy, and 340 on Martha's Vineyard. It notes that "the number of pure blooded Indians [at Mashpee] is extremely small, say fifty or sixty, and is rapidly decreasing," and that these Indians "have altogether adopted the habits of civilized life." It says that Harvard College and a religious society provide for the Indians' moral and religious instruction while the State takes care of the "infirm and aged poor" and manages their lands. It states that the number of Indians at Marshpee is "diminishing, though rather slowly," and that those at Herring Pond--"not more than forty"--have considerable territory "but their affairs are embarrassed and probably at no distant day, Government will see fit to dispose of their land." If we apply the legal standard of Mashpee I to this document, it suggests that as of 1820 the Mashpees, Herring Ponds, and Troys "inhabit[ed] a particular territory," but it does not suggest that they were "united in one community under one leadership or government," and it is ambivalent on the matter of "same or similar race." A fortiori, it is inadequate to show the existence of these tribes as a matter of fact at the relevant time of conveyancing, fifty years or more later.
 
 
 7
 The remaining documents add nothing of factual value. The second document, an appendix to "Indian Treaties and Laws and Regulations Relating to Indian Affairs" of 1826 uses the same numbers as the 1820 document. Thus, one might reasonably believe its author simply took his numbers from Rev. Morse. The third document, published in 1834, repeats the Morse numbers and adds nothing to them. The fourth document, an 1850 Bureau of Indian Affairs survey by Henry Schoolcraft, also seems to be based on the 1820 Morse Report. The number of Indians that it lists as living in Maine, for example, is 956, the same number Morse used 25 years earlier. Schoolcraft says there were 847 Indians living in Massachusetts, 107 more than Morse reported in 1820, but Schoolcraft's tables list several tribes not mentioned in the earlier report. Schoolcraft does not describe the factual circumstances under which the Indians live, but he contrasts their condition to other Indians whom he calls "tribes" by referring to the Massachusetts Indians as "fragmentary tribes." Thus, appellants had good reason for declining to argue that these documents could support a factual finding of tribal status. We do not see how, simply as measured under the Montoya standard, they could do so.
 
 
 8
 Appellants instead claim that the four documents (along with the underlying facts they evidence) are enough to show that the federal government has recognized the five entities as "tribes." And they argue that the federal courts, as a matter of law, must follow the lead of the executive branch in these matters. They cite the Supreme Court's statement 120 years ago:
 
 
 9
 In reference to all matters of this kind, it is the rule of this court to follow the action of the executive and other political departments of the government, whose more special duty is to determine such affairs. If by them those Indians are recognized as a tribe, this court must do the same.
 
 
 10
 United States v. Holliday, 70 U.S. (3 Wall.) 407, 419, 18 L.Ed. 182 (1866). The difficulty with this argument is that neither the executive nor the legislative branch of the federal government has recognized the five entities as tribes; and the four documents fail to show the contrary.
 
 
 11
 The ordinary standard for "recognition" is set forth by Professor Cohen as follows:
 
 
 12
 Normally a group will be treated as a ... "recognized" tribe if (a) Congress or the Executive has created a reservation for the group by treaty, agreement, statute, executive order, or valid administrative action; and (b) the United States has had some continuing political relationship with the group.
 
 
 13
 F. Cohen, Handbook of Federal Indian Law 6 (1982). This standard is not met. A congressionally authorized compilation of all such documents from the nineteenth century that might satisfy this standard (including proclamations and unratified treaties) was published in 1904. See C. Kappler, Indian Affairs, Sen. Doc. 319, 58th Cong., 2d Sess. (1904). The two volumes of this compilation do not mention any of the five groups before us. In addition, the Supreme Court, in a case decided after the publication of the four documents here in issue, described the Massachusetts Indians as "remnants of tribes never recognized by the treaties or executive acts of the United States as distinct political bodies." Elk v. Wilkins, 112 U.S. 94, 108, 5 S.Ct. 41, 48, 28 L.Ed. 643 (1884). Recently, the Bureau of Indian Affairs has published a list that purports to include all Indian groups acknowledged as tribes either by executive or administrative action. See 51 Fed.Reg. 25115 (July 10, 1986). That list does not contain the names of any of the five Indian entities. Given this negative evidence, we do not see how (1) Rev. Morse's Report to the Secretary of War, (2) a reference in a statistical table in the War Department's Office of Indian Affairs Report, (3) a reference without tribal names in a House of Representatives Committee Report, and (4) a reference to "fragmentary tribes" in a Bureau of Indian Affairs Report can constitute federal recognition. These documents, whether taken individually or together, do not provide evidence of a "treaty, agreement, statute, executive order, valid administrative action," or of a continuing relationship between the Indian groups and the United States.
 
 
 14
 The sole authority arguably supporting appellants' claim to the contrary is an 1896 court of claims case, Tully v. United States, 32 Ct.Cl. 1 (1896), in which that court cited reports by Bureau of Indian Affairs agents as evidence of federal recognition of tribes. That case, however, involved an Indian group that, as a matter of fact, met the Montoya definition of "tribe." The group in question inhabited a specified geographical area, was composed of a related group of families, and had separate political leadership. Moreover, the group's parent nation, the Apache Nation, had been recognized by treaty, and sought to show that the group was a separately recognized tribe so that the Nation would not be held liable as a whole for the damage the subgroup had caused. See Indian Depredation Act of 1891, 26 Stat. 857. The fact that the court of claims used the agents' reports as additional evidence, given the facts, of an affiliated subgroup's separate status for Depredation Act purposes does not show that such evidence is sufficient, in the absence of strong supporting facts, to show that a group is a "tribe" for land recovery purposes. Thus, Tully does not change our previous conclusion.
 
 
 15
 Finally, the appellants argue that the government is "estopped" from denying their status as a tribe. By this argument they apparently mean that the government, having caused the deterioration of tribal life and the disappearance of these tribes, should not now be allowed to take legal advantage of those wrongs by being permitted to deny the existence of the very organization they destroyed. Cf. Glus v. Brooklyn Eastern District Terminal, 359 U.S. 231, 232, 79 S.Ct. 760, 761, 3 L.Ed.2d 770 (1959) (noting that the principle that "no man may take advantage of his own wrong" is "deeply rooted in our jurisprudence"). Even if we leave aside such legal questions, however, as whether it is legally permissible here to estop the federal government, see Heckler v. Community Health Services of Crawford County, Inc., 467 U.S. 51, 59, 104 S.Ct. 2218, 2223, 81 L.Ed.2d 42 (1984); Phelps v. Federal Emergency Management Agency, 785 F.2d 13, 17 (1st Cir.1986), or whether appellants have shown that the federal government in fact caused these tribes to disappear, we cannot accept this argument. If it is interpreted as broadly as appellants must interpret it to prevail, it proves too much. Because many, if not all, former Indian tribes disappeared as a result of the encroachment of non-Indian culture, the argument, in effect, would nullify the legal requirement we previously pointed out that Indian groups prove tribal status. The law does not permit us to nullify that requirement.
 
 The judgment of the district court is
 
 16
 Affirmed.
 
 
 17
 NOTE: OPINION CONTAINS TABLE OR OTHER DATA THAT IS NOT VIEWABLE
 
 
 18
 NOTE: OPINION CONTAINS TABLE OR OTHER DATA THAT IS NOT VIEWABLE
 
 
 19
 NOTE: OPINION CONTAINS TABLE OR OTHER DATA THAT IS NOT VIEWABLE
 
 
 20
 NOTE: OPINION CONTAINS TABLE OR OTHER DATA THAT IS NOT VIEWABLE
 
 
 21
 NOTE: OPINION CONTAINS TABLE OR OTHER DATA THAT IS NOT VIEWABLE
 
 
 22
 NOTE: OPINION CONTAINS TABLE OR OTHER DATA THAT IS NOT VIEWABLE
 
 
 23
 NOTE: OPINION CONTAINS TABLE OR OTHER DATA THAT IS NOT VIEWABLE
 
 
 24
 NOTE: OPINION CONTAINS TABLE OR OTHER DATA THAT IS NOT VIEWABLE
 
 
 25
 NOTE: OPINION CONTAINS TABLE OR OTHER DATA THAT IS NOT VIEWABLE
 
 
 26
 NOTE: OPINION CONTAINS TABLE OR OTHER DATA THAT IS NOT VIEWABLE
 
 
 27
 NOTE: OPINION CONTAINS TABLE OR OTHER DATA THAT IS NOT VIEWABLE
 
 
 28
 NOTE: OPINION CONTAINS TABLE OR OTHER DATA THAT IS NOT VIEWABLE
 
 
 29
 NOTE: OPINION CONTAINS TABLE OR OTHER DATA THAT IS NOT VIEWABLE
 
 
 30
 NOTE: OPINION CONTAINS TABLE OR OTHER DATA THAT IS NOT VIEWABLE
 
 
 31
 NOTE: OPINION CONTAINS TABLE OR OTHER DATA THAT IS NOT VIEWABLE
 
 
 32
 NOTE: OPINION CONTAINS TABLE OR OTHER DATA THAT IS NOT VIEWABLE
 
 
 33
 NOTE: OPINION CONTAINS TABLE OR OTHER DATA THAT IS NOT VIEWABLE
 
 
 34
 NOTE: OPINION CONTAINS TABLE OR OTHER DATA THAT IS NOT VIEWABLE
 
 
 35
 NOTE: OPINION CONTAINS TABLE OR OTHER DATA THAT IS NOT VIEWABLE
 
 
 36
 NOTE: OPINION CONTAINS TABLE OR OTHER DATA THAT IS NOT VIEWABLE
 
 
 37
 NOTE: OPINION CONTAINS TABLE OR OTHER DATA THAT IS NOT VIEWABLE
 
 
 38
 NOTE: OPINION CONTAINS TABLE OR OTHER DATA THAT IS NOT VIEWABLE
 
 
 39
 NOTE: OPINION CONTAINS TABLE OR OTHER DATA THAT IS NOT VIEWABLE