NARRAGANSETT INDIAN TRIBE OF
RHODE ISLAND and Narragansett In-
dian Wetuomuck Housing Authority,
Plaintiffs—Appellees,

v.

NARRAGANSETT ELECTRIC
COMPANY, Defendant—
Appellee.

State of Rhode Island, Defendant—
Appellant.

NARRAGANSETT INDIAN TRIBE OF
RHODE ISLAND and Narragansett In-
dian Wetuomuck Housing Authority,
Plaintiffs—Appellees,

v.

NARRAGANSETT ELECTRIC
COMPANY, Defendant—
Appellee.

Town of Charlestown, Intervenor—
Appellant.

Nos. 95–1944, 95–1945.

United States Court of Appeals,
First Circuit.

Heard Jan. 9, 1996.

Decided July 22, 1996.

Alan M. Shoer, Special Assistant Attorney General, with whom Jeffrey B. Pine, Attorney General, James E. Purcell, Partridge, Snow & Hahn, Providence, RI, Phillip M. Sloan, Solicitor, Town of Charlestown, and Bruce N. Goodsell, Assistant Town Solicitor, Westerly, RI, were on brief for appellants.

Randall L. Souza, with whom Fred A. Kelly, Jr., Peter V. Lacouture and Peabody & Brown, Providence, RI, were on brief for the Narragansett Electric Company.

John F. Killoy, Jr., with whom Law Office of H. Jefferson Melish, Wakefield, RI, was on brief for the Narragansett Indian Tribe of Rhode Island and the Narragansett Indian Wetuomuck Housing Authority.

Before TORRUELLA, Chief Judge, ROSENN,* Senior Circuit Judge, and LYNCH, Circuit Judge.

TORRUELLA, Chief Judge.

Defendant-intervenors the town of Charlestown (the "Town") and the State of Rhode Island (together, the "State") seek a permanent injunction prohibiting plaintiffs

* Of the Third Circuit, sitting by designation.

the Narragansett Indian Tribe (the "Tribe") and the Narragansett Indian Wetuomuck Housing Authority (the "WHA") from· constructing a housing complex without obtaining various permits and approvals pursuant to state law and local ordinances.[1] At the heart of the issue lies the question of whether the land in question is "Indian country" as that term is defined in 18 U.S.C. § 1151(b). The district court found that it is, by virtue of being a dependent Indian community, and so declined in part to issue the injunction sought by the State and the Town. We, however, find it is not, and so, for the reasons stated herein, we reverse in part and affirm in part.

## BACKGROUND

The district court relied on the evidence presented at an evidentiary hearing regarding the State's motion for a preliminary injunction, which evidence the parties stipulated could serve as the basis for the district court's decision.[2] *Narragansett Indian Tribe v. Narragansett Elec.*, 878 F.Supp. 349, 352 (D.R.I.1995) ("*Narragansett I*"). As the parties raise no challenges to the district court's findings, we rely on them as well.[3]

In 1991 the WHA purchased the land which is at the center of this dispute (the "housing site") from a private developer. *See id.* at 354 (detailing history of purchase of the housing site). The housing site is adjacent to the Tribe's other lands, separated from them by a town road. The Tribe's church, the long house which serves as the seat of the Tribal Assembly, and the offices where the tribal government meets and programs for tribal members are administered are all established in close proximity to the

housing site; a proposed tribal community center and tribal health center are to be constructed on the settlement lands as well. The approximately 32 acres of the housing site is located within the coastal zone designated in the State's Coastal Resources Management Program ("CRMP"). Also, the section of the Town in which the housing site is located is zoned to require at least two acres of land per residential unit, a requirement the proposed project does not meet, as it will have some fifty units. As the district court noted, although occupancy is open to anyone "it is contemplated that most, if not all of the units, will be occupied by elderly and low-income members of the Tribe." *Id.*

The United States Department of Housing and Urban Development ("HUD") has recognized the WHA as an Indian Housing Authority, and has provided the financing for the purchase of the housing site and the construction of the buildings. HUD will also provide money both for managing the project and for subsidizing the occupants' rent. The HUD funds have been made pursuant to a program designed to provide housing for Indians. *See* The Indian Housing Act of 1988, 42 U.S.C. §§ 1437aa–1437ff.

The WHA bought the land, and then conveyed it to the Tribe. A deed restriction requires that the land be placed in trust with the federal government, for the express purpose of providing housing for tribal members. The district court found that the Tribe had applied for trust status, but that the application had not yet been granted. Meanwhile, the land has been leased to the WHA, with the approval of the Bureau of Indian Affairs ("BIA").

---

**1.** This suit was initially brought by plaintiffs against the Narragansett Electric Company, a Rhode Island public utility corporation. Plaintiffs asserted subject matter jurisdiction under 28 U.S.C. §§ 1331 and 1362. The State subsequently intervened in the lawsuit and filed a counterclaim for declaratory and injunctive relief against the plaintiffs, and it is the State's counterclaim that underlies this appeal. The Narragansett Electric Company takes no position with respect to the issues raised by the State in this appeal. We add that, because the plaintiffs have asserted no claims against the State, this action does not implicate Eleventh Amendment concerns, and the Supreme Court's decision in *Seminole Tribe*

*of Florida v. Florida,* —— U.S. ——, 116 S.Ct. 1114, 134 L.Ed.2d 252 (1995) is inapposite here.

**2.** As the district court noted, the request for a permanent injunction we address here relates only to the construction of the housing complex. We do not express an opinion on any remaining portions of the case.

**3.** The parties do dispute whether the trust application has been withdrawn. However, as counsel for the Tribe agreed at oral argument, the record here simply shows that the application has been made and not acted on or withdrawn.

The WHA began construction on the housing site without a building permit from the Town or state approval of the individual sewage disposal systems (the "ISDS") serving the project. Nor did the WHA "obtain any determination that the project is consistent with Rhode Island's CRMP or state regulations designed to preserve property of historical or archeological significance." *Narragansett I,* 878 F.Supp. at 354. The district court found that the excavation for the project has infringed on the Town's drainage easement, and has threatened to alter drainage patterns to the detriment of coastal and groundwater resources. At the same time, however, the ISDS systems meet Indian Health Service ("IHS") regulations.[4] "[T]he record is silent regarding the differences, if any, between the State's building code and the Tribe's building code or what the significance of any such differences may be." *Id.* at 355.

To further complicate the picture, "[t]he ·evidence demonstrates that the housing site is in close proximity to Ninigret Pond, a fragile salt water estuary that is a prime spawning ground for several species of commercially important fish." *Id.* The district court found that the pond is "ecologically stressed" already, due to nitrates in the ground water, and that the possibility exists that nitrates from the WHA's ISDS systems could reach the pond "and worsen an already serious problem." *Id.*

In its detailed opinion, the district court concluded that the housing site is indeed a "dependent Indian community," and thus is Indian country under 18 U.S.C. § 1151. Noting that "tribal sovereignty is no longer an absolute bar to the assertion of state authority in Indian country," *Narragansett I,* 878 F.Supp. at 359, the court carried out a pre-emption analysis. It concluded that the State's building and zoning regulations were pre-empted, as was its jurisdiction to regulate the ISDS systems. However, it found that Rhode Island's CRMP was not pre-empted, and accordingly enjoined the WHA and the Tribe from occupying buildings on the housing site unless that program's requirements were satisfied. It also enjoined them from interfering with the drainage easement previously conveyed to the Town.[5]

■ We review the grant of a permanent injunction under an abuse of discretion standard. *See Caroline T. v. Hudson Sch. Dist.,* 915 F.2d 752, 754–55 (1st Cir.1990) (noting that abuse of discretion standard applies to both preliminary and permanent injunctions); *cf. Narragansett Indian Tribe v. Guilbert,* 934 F.2d 4, 5 (1st Cir.1991) (applying abuse of discretion standard to grant of preliminary injunction).

## DISCUSSION

### A. *The Settlement Act*

The State makes its first argument on the basis of the Rhode Island Indian Claims Settlement Act of 1978, 25 U.S.C. §§ 1701–1716 (the "Settlement Act"). We begin with the history of the Settlement Act, and then address the State's contention.

#### 1. *Background*

The background of the relationship between the Tribe and the State has been addressed in some detail by the district court below, *Narragansett I,* 878 F.Supp. at 353–55, as well as in prior decisions of the courts of this circuit, *see Rhode Island v. Narragansett Indian Tribe,* 19 F.3d 685, 689 (1st Cir.), *cert. denied,* —— U.S. ——, 115 S.Ct. 298, 130 L.Ed.2d 211 (1994); *Maynard v. Narragansett Indian Tribe,* 984 F.2d 14, 15–16 (1st Cir.1993); *Town of Charlestown v. United States,* 696 F.Supp. 800, 801–05 (D.R.I.1988), *aff'd,* 873 F.2d 1433 (1st Cir.1989); *Narragansett Tribe of Indians v. Murphy,* 426 F.Supp. 132, 134 (D.R.I.1976); *Narragansett Tribe of Indians v. Southern R.I. Land Dev. Corp.,* 418 F.Supp. 798, 802–03 (D.R.I.1976).

---

4. IHS is an agency of the Department of Health and Human Services.

5. The Tribe has not appealed from the district court's partial grant of injunctive relief. The court found that it did not need to make a determination regarding whether state regulations regarding property with historical and/or archeological significance applied, since the Rhode Island Historical Preservation Commission had notified the Tribe that it had no objection to the project as planned.

Therefore, rather than enter into a detailed discussion, we will simply outline the essential structure of the historical underpinnings of the State's first argument.

In the mid–1970s, the Tribe brought two actions to establish its right to possession of lands which it contended were unlawfully held by the State as well as private individuals and businesses. The ground for its claims was that the lands had been unlawfully alienated in violation of the Indian Nonintercourse Act, 25 U.S.C. § 177. *See Southern R.I. Land Dev. Corp.*, 418 F.Supp. at 802–03 (recounting history of dispute). The parties to the dispute settled the claims in 1978 by entering into a Joint Memorandum of Understanding. The Tribe relinquished its title claims, and in return received a sum of money[6] and effective control over some 1,800 acres of land, whose title was held by a corporation (the "settlement lands"). Implementing legislation was passed by the United States Congress in the form of the Settlement Act, and by the Rhode Island legislature as well, *see* Narragansett Indian Land Management Corporation Act, 6A R.I. Gen. Laws §§ 37–18–1 to 37–18–15 (1990). *See generally Town of Charlestown*, 696 F.Supp. at 801–05 (detailing the history and provisions of the Settlement Act).

In 1983, the Narragansetts were officially recognized as an Indian tribe. *See Narragansett Indian Tribe*, 19 F.3d at 689. In 1988, the Tribe deeded the settlement lands to the BIA, to be held in trust. *Id.* This court has held that although the Settlement Act allows State civil and criminal jurisdiction over the settlement lands, with some exceptions, the Tribe nonetheless has "concurrent jurisdiction over, and exercise[s] governmental power with respect to, those lands." *Id.* (holding that the Indian Gaming Regulatory Act, 25 U.S.C. §§ 2701–2721, 18 U.S.C. §§ 1166–1168, applies to the settlement lands).

### 2. *The Present Dispute*

The State's first contention in the present case is that the Settlement Act precludes a finding that the housing site, which is not part of the settlement lands, is Indian country, because that Act resolved the Tribe's land claims and established the boundaries of the Tribe's Indian country in Rhode Island. It maintains that we should interpret section 1705(a)(3) of the Settlement Act as extinguishing all of the Tribe's claims and limiting the boundaries of its Indian country.[7] The linchpin of its argument is its contention that it was Congress' intent in the Settlement Act to set definite limits to the Tribe's Indian country and to extinguish any claim to greater boundaries, and congressional intent must prevail. *See Rosebud Sioux Tribe v. Kneip*, 430 U.S. 584, 586, 97 S.Ct. 1361, 1363, 51 L.Ed.2d 660 (1977) (noting "that congressional intent will control" in determining whether a reservation has been terminated). Such a specific statute, it maintains, overrides the general definition of "Indian country."

The Tribe responds with two counter-arguments. First, it maintains that the State effectively waived this argument by making only passing reference to it in the court below, without supporting it with statutory analysis or legal authority. *See Rodriguez–Pinto v. Tirado–Delgado*, 982 F.2d 34, 41 (1st

---

6. The Tribe notes that it disagrees with the district court's statement that the Tribe received a payment under the Settlement Act, maintaining that there was neither a payment to the Tribe nor a distribution of money or land to individual Tribe members. Whether or not the Tribe received a payment is irrelevant to our consideration of the issue at hand.

7. The pertinent section provides that upon the State's compliance with the conditions of the Settlement Act, and the recognition of the same by the Secretary of the Interior,

> by virtue of the approval of a transfer of land or natural resources effected by this section, or an extinguishment of aboriginal title effected thereby, all claims against the United States, any State or subdivision thereof, or any other person or entity, by the Indian Corporation or any other entity presently or at any time in the past known as the Narragansett Tribe of Indians, or any predecessor or successor in interest, member or stockholder thereof, or any other Indian, Indian nation, or tribe of Indians, arising subsequent to the transfer and based upon any interest in or right involving such land or natural resources (including but not limited to claims for trespass damages or claims for use and occupancy) shall be regarded as extinguished as of the date of the transfer.

25 U.S.C. § 1705(a)(3).

Cir.1993) (reaffirming that "arguments made in a perfunctory manner below are deemed waived on appeal").

 Second, the Tribe contends that even if the argument was not waived, the Settlement Act only extinguished the Tribe's *aboriginal* title claims. "Aboriginal title," alternatively called "Indian title," is "the right of Indian tribes to use and occupy 'lands they had inhabited from time immemorial.'" *Mashpee Tribe v. Secretary of the Interior,* 820 F.2d 480, 481–82 (1st Cir.1987) (quoting *County of Oneida v. Oneida Indian Nation,* 470 U.S. 226, 234, 105 S.Ct. 1245, 1251, 84 L.Ed.2d 169 (1985)). The Tribe points out that this is not a title action, and that it does not claim aboriginal title to the housing site. Further, it notes that on the face of section 1705(a)(3), the Tribe agreed to "an extinguishment of aboriginal title," but there is no express language in the statute extinguishing any right to purchase other lands. If the Settlement Act did not abrogate the Tribe's right to purchase other lands, the Tribe continues, it did not limit its ability to gain sovereign authority over such lands that it acquires. The weight of this reading of the statute is heightened by the "distinctive perspective" from which we view statutes that "touch on Indian sovereignty." *State of R.I.,* 19 F.3d at 691. "The congressional intent [to terminate a reservation] must be clear, to overcome 'the general rule that "[d]oubtful expressions are to be resolved in favor of the weak and defenseless people who are the wards of the nation....""'" *DeCoteau v. District County Court,* 420 U.S. 425, 444, 95 S.Ct. 1082, 1093, 43 L.Ed.2d 300 (1975) (quoting *McClanahan v. Arizona State Tax Comm'n,* 411 U.S. 164, 174, 93 S.Ct. 1257, 1263, 36 L.Ed.2d 129 (1973) (quoting *Carpenter v. Shaw,* 280 U.S. 363, 367, 50 S.Ct. 121, 122, 74 L.Ed. 478 (1930))). Paternalistic phrasing aside, it is well established that "[a] congressional determination to terminate [a reservation] must be expressed on the face of the Act or be clear from the surrounding circumstances and legislative history." *Mattz v. Arnett,* 412 U.S. 481, 505, 93 S.Ct. 2245, 2258, 37 L.Ed.2d 92 (1973).

The importance of this dispute over whether the Settlement Act terminates the Tribe's ability to increase the territory over which it possesses sovereignty is manifest. No matter how we hold, the significance of our decision will reach well beyond the confines of the current dispute. Indeed, in its brief the State points to at least one pending case in which the issue arises. Nonetheless, we leave this question, which the district court did not address in its lengthy opinion, for another day. Regardless of whether the issue has in fact been waived, we need not establish in this dispute whether the Settlement Act limits the Tribe's Indian country, as we conclude on independent grounds that the housing site is not a dependent Indian community, and therefore is not Indian country. Thus we will wait to address the issue on the basis of more developed discussion below; while it is at heart a question of statutory interpretation, we nonetheless prefer to address the Settlement Act question at a time when the parties, and the court below, have addressed it more fully.

## B. *Indian Country*

### 1. *The Significance of "Indian Country"*

 Serving as the backdrop to this case is the doctrine that "Indian tribes are 'domestic dependent nations' that exercise inherent sovereign authority over their members and territories." *Oklahoma Tax Comm'n v. Citizen Band Potawatomi Indian Tribe,* 498 U.S. 505, 509, 111 S.Ct. 905, 909, 112 L.Ed.2d 1112 (1991) (citing *Cherokee Nation v. Georgia,* 5 Pet. 1, 17, 8 L.Ed. 25 (1831)); *see McClanahan,* 411 U.S. at 168–69, 93 S.Ct. at 1260–61 (outlining the roots of the Indian sovereignty doctrine). This rule has softened over time, so that it is no longer true that state law plays no role within a tribe's territory. Nonetheless, the state's jurisdiction is not automatic. "[S]tate laws may be applied to tribal Indians on their reservations if Congress has expressly so provided," *California v. Cabazon Band of Mission Indians,* 480 U.S. 202, 207, 107 S.Ct. 1083, 1087, 94 L.Ed.2d 244 (1987); where Congress does not so provide, a pre-emption analysis is followed to determine if state law is pre-empted by federal and tribal interests

as reflected in federal law. *See id.* at 216, 107 S.Ct. at 1091–92; *DeCoteau,* 420 U.S. at 427 & n. 2, 95 S.Ct. at 1084–85 & n. 2; *McClanahan,* 411 U.S. at 172, 93 S.Ct. at 1262.

■ In short, "it would vastly oversimplify the problem to say that nothing remains of the notion that reservation Indians are a separate people to whom state jurisdiction … may not extend." *McClanahan,* 411 U.S. at 170, 93 S.Ct. at 1261. Therefore, the issue here of whether the housing site is Indian country bears real significance, since "the Indian country classification is the benchmark for approaching the allocation of federal, tribal, and state authority with respect to Indians and Indian lands." *Indian Country, U.S.A. v. Oklahoma Tax Comm'n,* 829 F.2d 967, 973 (10th Cir.1987) (collecting cases), *cert. denied sub nom. Oklahoma Tax Comm'n v. Muscogee (Creek) Nation,* 487 U.S. 1218, 108 S.Ct. 2870, 101 L.Ed.2d 906 (1988); *see Oklahoma Tax Comm'n v. Sac and Fox Nation,* 508 U.S. 114, 125, 113 S.Ct. 1985, 1991, 124 L.Ed.2d 30 (1993) (rejecting argument that Indian sovereignty only applies to formal reservation lands, stating "we ask only whether the land is Indian country"); *Cohen's Handbook of Federal Indian Law* 27 (1982 ed.) ("[F]or most jurisdictional purposes the governing legal term is 'Indian country.' "). If the housing site is not Indian country, there is no bar to the exercise of the State's jurisdiction. If it is, the State presumptively lacks jurisdiction to enforce the regulations and ordinances discussed here, and we must carry out a pre-emption analysis.

### 2. *The Section 1151 Definition of "Indian Country"*

■ The obvious question, then, is what constitutes "Indian country." Congress has defined the term as including

(a) all land within the limits of any Indian reservation under the jurisdiction of the United States Government, … (b) all dependent Indian communities within the borders of the United States whether within the original or subsequently acquired territory thereof, and whether within or

without the limits of a state, and (c) all Indian allotments. …

18 U.S.C. § 1151; *see Oklahoma Tax Comm'n v. Sac and Fox Nation,* 508 U.S. 114, 123, 113 S.Ct. 1985, 1990–91, 124 L.Ed.2d 30 (1993) (noting broad nature of definition); *United States v. Levesque,* 681 F.2d 75, 77 (1st Cir.) (discussing origins of § 1151(b)), *cert. denied,* 459 U.S. 1089, 103 S.Ct. 574, 74 L.Ed.2d 936 (1982); *Alaska* v. *Native Village of Venetie Tribal Gov't,* 1995 WL 462232, *1–*5 (D.Alaska Aug. 2, 1995) (detailing the history of the concept of Indian country). Here, as the housing site is neither part of a formal reservation nor an allotment, the present dispute is over whether it constitutes a "dependent Indian community" for purposes of subsection (b) of section 1151, a dispute we discuss at length below.

Before addressing that issue, however, we recognize that, as the State notes, section 1151 on its face is concerned only with criminal jurisdiction. Nonetheless, the Supreme Court has repeatedly stated that the definition provided in section 1151 "applies to questions of both criminal and civil jurisdiction." *Cabazon Band of Mission Indians,* 480 U.S. at 208, 107 S.Ct. at 1088; *see also DeCoteau,* 420 U.S. at 427, 95 S.Ct. at 1084–85. Elsewhere, the Court has simply defined "Indian country" in civil cases in terms closely paralleling those of section 1151, while citing to that statute. *See Oklahoma Tax Comm'n v. Chickasaw Nation,* 510 U.S. 994, ——, 115 S.Ct. 2214, 2217 n. 2, 132 L.Ed.2d 400 (1995); *Sac and Fox,* 508 U.S. at 123, 113 S.Ct. at 1990–91. Other circuits have followed suit. *See, e.g., Buzzard v. Oklahoma Tax Comm'n,* 992 F.2d 1073, 1076 (10th Cir.), *cert. denied sub nom. United Keetoowah Band of Cherokee Indians v. Oklahoma Tax Comm'n,* 510 U.S. 994, 114 S.Ct. 555, 126 L.Ed.2d 456 (1993); *Alaska v. Native Village of Venetie,* 856 F.2d 1384, 1390 (9th Cir. 1988); *Indian Country, U.S.A.,* 829 F.2d at 973; *see also United States v. South Dakota,* 665 F.2d 837, 838 n. 3 (8th Cir.1981) (applying § 1151 in determining whether a housing project was a dependent Indian community), *cert. denied,* 459 U.S. 823, 103 S.Ct. 52, 74 L.Ed.2d 58 (1982). It appears manifest that we can, and should, do the same.

The State would have us conclude otherwise. First, it calls our attention to *Confederated Tribes and Bands of the Yakima Nation v. County of Yakima,* 903 F.2d 1207 (9th Cir.1990), *aff'd on other grounds,* 502 U.S. 251, 112 S.Ct. 683, 116 L.Ed.2d 687 (1992). In that case, the Ninth Circuit refused to apply section 1151 to the question of whether fee patented land could be taxed by the state. The court's refusal was based on the reality that, on its terms, section 1151 is a criminal statute, as well as the fact that the taxing power at issue was governed by a noncriminal federal statutory scheme. *Id.* at 1215. The *Yakima* court made its brief analysis without mentioning any of the Supreme Court cases cited above. The State looks to *Yakima* as support for its argument that to transplant section 1151 into the civil context would go against both the plain meaning of the statute and congressional intent. We reject the State's suggestion that we follow the Ninth Circuit's logic in *Yakima,* since to the extent that case supports the conclusion that section 1151 only applies in criminal cases,[8] it directly contradicts the guidance of the Supreme Court. *See Chickasaw Nation,* — U.S. at — n. 2, 115 S.Ct. at 2217 n. 2; *Sac and Fox,* 508 U.S. at 123, 113 S.Ct. at 1990–91; *Cabazon Band of Mission Indians,* 480 U.S. at 207, 107 S.Ct. at 1087; *DeCoteau,* 420 U.S. at 427, 95 S.Ct. at 1084–85; *see also Pittsburg & Midway Coal Mining Co. v. Watchman,* 52 F.3d 1531, 1540 (10th Cir. 1995) (rejecting argument that definition only applies in criminal cases).

Second, the State delves into the Supreme Court cases that provide that section 1151

applies in the civil context, attempting to distinguish them from the present case, questioning their logic and underpinnings, and concluding that the premise that section 1151 is relevant in determining a state's civil regulatory authority is in "serious question." We need not address these arguments in detail. *See Watchman,* 52 F.3d at 1540 n. 10 (rejecting similar arguments). Aside from the fact that the Court reiterated its reliance on section 1151 for questions of civil jurisdiction as recently as 1995, *see Chickasaw Nation,* — U.S. at — n. 2, 115 S.Ct. at 2217 n. 2, we see no reason why the Court should not seize on the definition Congress has offered of what constitutes Indian country in the context of criminal jurisdiction to inform its analysis of Indian country in questions of civil jurisdiction. *See Cohen's Handbook of Federal Indian Law* 28 (noting historical and statutory support for Supreme Court application of § 1151 to questions of civil jurisdiction).

### 3. *Dependent Indian Communities*

With the background set out and our standard of review established, we turn to the central issue of whether the housing site constitutes a "dependent Indian community." We note that the question of whether land owned by an Indian tribe may fall within a state's civil regulatory jurisdiction appears to be one of first impression in this circuit. *See Narragansett I,* 878 F.Supp. at 352.

The inclusion of "dependent Indian communities" in the definition of Indian country dates to Supreme Court cases from the early

---

8. The parties did not discuss the fact that the Supreme Court has affirmed and remanded the holding in *Yakima, see* 502 U.S. at 251, 112 S.Ct. at 684–85, perhaps because the Court did not directly address the Ninth Circuit's discussion of section 1151. That section is cited only twice in the Court's decision. It first appears, without real comment, in the majority's summation of the Yakima Nation's argument that section 6 of the Indian General Allotment Act of 1887 is a dead letter. 502 U.S. at 260, 112 S.Ct. at 689 (citing the 1948 passage of section 1151 with its definition of Indian country as impliedly repealing section 6's jurisdictional grant). Next, in his separate opinion, Justice Blackmun notes that the majority conceded that section 6 can no longer be read as providing plenary jurisdiction over Indians who reside on reservation fee lands.

502 U.S. at 271, 112 S.Ct. at 694–95 (Blackmun, J., concurring in part and dissenting in part). In support of that position, he cites to *DeCoteau,* 420 U.S. at 428 n. 2, 95 S.Ct. at 1085 n. 2, for the premise that the section 1151 definition "demarcates [the] general boundary of civil jurisdiction of States." *Id.*

Since the Supreme Court's opinion in *Yakima* gives no indication that the Court either agrees with the Ninth Circuit's discussion of section 1151 or is calling its own prior statements into doubt, and since it has subsequently reaffirmed that the definition carries into an analysis of civil jurisdiction, *see Chickasaw Nation,* — U.S. at — n. 2, 115 S.Ct. at 2217 n. 2, we will continue to follow the Court's guidance on the application of section 1151.

part of this century. *See United States v. Sandoval,* 231 U.S. 28, 46, 34 S.Ct. 1, 5, 58 L.Ed. 107 (1913) ("[L]ong continued legislative and executive usage and an unbroken current of judicial decisions have attributed to the United States as a superior and civilized nation the power and the duty of exercising a fostering care and protection over all dependent Indian communities within its borders ...."); *see also United States v. McGowan,* 302 U.S. 535, 538–39, 58 S.Ct. 286, 287–88, 82 L.Ed. 410 (1938). Exactly what constitutes a "dependent Indian community," however, has not been defined. Instead, courts addressing the question conduct "a functional inquiry into the nature of the community," weighing a series of factors established by case law. *Levesque,* 681 F.2d at 77.

While we have not previously faced the precise issue raised here, in *United States v. Levesque* we addressed whether a region is a dependent Indian community for the purposes of criminal jurisdiction, framing our focus in terms of whether the land is "both 'Indian' in character and federally dependent." *See id.* at 77. In that case, we applied the factors set out by the Tenth Circuit in *United States v. Martine,* 442 F.2d 1022 (10th Cir.1971), namely:

> the nature of the area in question; the relationship of the inhabitants of the area to Indian Tribes and the federal government, and the established practice of government agencies toward the area.

*Id.* at 1023 (drawing factors from the discussion in *Sandoval,* 231 U.S. at 45–49, 34 S.Ct. at 5–7). Other cases determining whether an area constitutes a dependent Indian community, including Tenth Circuit decisions, have relied on additional factors introduced into the case law by the Eighth Circuit in *United States v. South Dakota,* 665 F.2d 837 (8th Cir.1981). *See, e.g., Watchman,* 52 F.3d at 1545 (adopting the *South Dakota* additions to the *Martine* list of factors); *Blatchford v. Sullivan,* 904 F.2d 542, 547 (10th Cir.1990), *cert. denied,* 498 U.S. 1035, 111 S.Ct. 699, 112 L.Ed.2d 689 (1991); *United States v. Azure,* 801 F.2d 336, 339 (8th Cir.1986); *Housing Auth. of the Seminole Nation v. Harjo,* 790 P.2d 1098, 1100 (Okla.1990). Following their lead, we shall expand upon our discussion in

*Levesque* to incorporate the *South Dakota* factors. *See Martine,* 442 F.2d at 1024 (noting that additional relevant factors may be considered).

Thus, our first factor is "whether the United States has retained 'title to the lands which it permits the Indians to occupy' and 'authority to enact regulations and protective laws respecting this territory.'" *South Dakota,* 665 F.2d at 839 (quoting *Weddell v. Meierhenry,* 636 F.2d 211 (8th Cir.1980), *cert. denied,* 451 U.S. 941, 101 S.Ct. 2024, 68 L.Ed.2d 329 (1981)). The second *South Dakota* factor encompasses the *Martine* factors, set out above. *Id.* Our third consideration is "whether there is 'an element of cohesiveness ... manifested either by economic pursuits in the area, common interests, or needs of the inhabitants as supplied by that locality.'" *Id.* (quoting *Weddell,* 636 F.2d at 212–13). The final *South Dakota* factor asks "'whether such lands have been set apart for the use, occupancy and protection of dependent Indian peoples.'" *Id.* (quoting *Weddell,* 636 F.2d at 213). Roughly speaking, the second and third factors weigh whether there is, in fact, an Indian community, and the first and fourth whether it is a dependent one. We accordingly address them in that order, ultimately concluding that the facts reveal that the housing site is not a dependent Indian community.

### The Martine Factors

The *Martine* factors mandate that a court "weigh the nature of the area in question; the relationship of the inhabitants of the area to Indian Tribes and the federal government, and the established practice of government agencies toward the area." *Martine,* 442 F.2d at 1023. These considerations support the Tribe's contention by demonstrating that the housing site is a community.

First, as the district court noted, the BIA has recognized the housing site is in an area "in which 'a distinct [Indian] community has existed since earliest European contact.'" *Narragansett I,* 878 F.Supp. at 356 (quoting BIA Internal Memorandum on Acknowledgement of Narragansett Indian Tribe, July 1982, at 9). While we recognize that fact,

however, we also note that it cannot be doubted that the Settlement Act extinguishes all claim to aboriginal title to the housing site. *See* 25 U.S.C. § 1705(a)(3). This factor, then, does not weigh in favor of the Tribe. In contrast, we do not doubt that there will be a significant relationship between the inhabitants of the housing site and the Tribe: indeed, the entire point of the project is to establish housing for Tribe members and to serve as "a means of bringing the Narragansetts back together." *Narragansett I*, 878 F.Supp. at 356. This weighs in favor of the Tribe.

Further, some relationship has been established between the federal government, in the form of HUD, IHS, and the BIA, and the housing site. HUD financed the purchase of the housing site, and recognizes the WHA as an Indian Housing Authority. It will provide monies for the management of the project and subsidize the occupants' rent, all pursuant to a program "specifically designed to provide housing for Indians." *Narragansett I*, 878 F.Supp. at 354; *see South Dakota*, 665 F.2d at 840 (remarking upon similar governmental activity as showing "[f]ederal concern for the [housing] project"). The district court noted that the fact that there is a relationship between HUD and the community "is underscored by the evidence that many of the occupants will participate in nutrition, education and job training programs subsidized by the federal government and administered by the Tribe on the adjacent settlement lands." *Narragansett I*, 878 F.Supp. at 357. However, we note that, as we find below, while a relationship exists to the extent that these federal entities are active in the housing site, their actions do not rise the level of setting apart the land for the use, occupancy, and protection of dependent Indian peoples.

### Cohesiveness

■ We next weigh whether there is an element of cohesiveness in the community, as demonstrated by economic pursuits, common interests, or the needs of the inhabitants.

*See Weddell*, 636 F.2d at 211 (noting that these elements are more important than density of population, percentage of Indian residents, or the history and background of the area). Certainly this factor weighs in favor of finding this a dependent Indian community: the project will help the Tribe supply housing to its elderly and low-income members.[9] Further, the housing site is in close proximity to the Tribe's church, the seat of the Tribal Assembly, the offices of the tribal government and the administration of federal programs—in short, it is indeed close to the "center of tribal government, culture and religious life." *Narragansett I*, 878 F.Supp. at 356. Nonetheless, the fact that the housing will be predominantly Indian in character is not enough, by itself, to establish the presence of a dependent Indian community. *See Blatchford*, 904 F.2d at 549 (noting that fact that "Indians constituted the bulk of the population and gave the area a distinctly Indian character does not convert the community into a dependent Indian community"); *Martine*, 442 F.2d at 1024 (holding that "[t]he mere presence of a group of Indians in a particular area" does not make it a dependent Indian community).

### Title and Authority

■ We turn now to the *South Dakota* factors which focus on whether the community is in fact a dependent one. First, we ask whether the United States retains title to the housing site and the authority to enact regulations and laws. As noted above, the federal government does not in fact hold title; rather, the housing site is held by the Tribe, who has leased the land to the WHA, in a lease approved by the BIA. While the Tribe has applied for trust status, as the record stands, that status has not been granted. The fact that the Tribe, not the government, owns the land does not preclude a finding that the housing site is a dependent Indian community. *See Sandoval*, 231 U.S. at 48, 34 S.Ct. at 6–7 (rejecting the argument that Pueblo Indians holding fee simple title to

9. The fact that occupancy is actually open to anyone, pursuant to HUD regulations, does not bar finding this a dependent Indian community. *See South Dakota*, 665 F.2d at 842 ("The fact that

a small number of non-Indians reside at the project does not defeat a finding of a dependent Indian community.").

lands precludes the lands from being Indian country); *Martine*, 442 F.2d at 1023 (finding that lands purchased by Navajo Tribe from third party, located in an area which is "a patchwork of land, some of which is owned by the Navajo Tribe, some of which is not" and which is not within a reservation, was a dependent Indian community); *cf. Indian Country, U.S.A.*, 829 F.2d at 975 (noting that patented fee title does not preclude finding territory is a reservation where fee title to the disputed area had passed to the Creek Nation by federal treaty). Nonetheless, this must weigh against the Tribe. *See Blatchford v. Sullivan*, 904 F.2d 542 (10th Cir.1990) (considering, *inter alia*, fact that private owner held land in determining that land was not dependent Indian community, although it was surrounded by Navajo allotment land); *Weddell*, 636 F.2d at 213 (noting, *inter alia*, that although land was within the exterior boundaries of the original Yankton Sioux Indian Reservation, it was privately held, and finding that the land was not a dependent Indian community for purposes of criminal jurisdiction).

The second part of this factor focuses upon the very issue in dispute here: who has the authority to enact regulations and laws. The State's authority will be determined by our decision here. As for the federal government, the record indicates that it has exercised authority in the form of HUD, IHS, and BIA activity, regulations and financing. Of course, HUD, at least, can provide financing and set regulations in other, non-Indian contexts. The record does not address whether there is more extensive federal regulation here by HUD than in any other HUD assisted, non-Indian project. Since this factor is largely determined by our decision today, we find it weighs neither for nor against the Tribe.

### Whether the Lands Have Been Set Apart

■ The last factor we address is whether the housing site has been set apart by the federal government for the use, occupancy, and protection of dependent Indian peoples. This proves to be the crucial factor in our discussion. *See Levesque*, 681 F.2d at 77

(noting that this is the "ultimate issue" in the factual analysis).

[T]he test for determining whether land is Indian country does not turn upon whether that land is denominated "trust land" or "reservation." Rather, we ask whether the area has been " 'validly set apart for the use of the Indians as such, under the superintendence of the Government.' "

*Citizen Band Potawatomi Indian Tribe*, 498 U.S. at 511, 111 S.Ct. at 910 (quoting *United States v. John*, 437 U.S. 634, 648–49, 98 S.Ct. 2541, 2549, 57 L.Ed.2d 489 (1978)); *see Sac and Fox*, 508 U.S. at 125, 113 S.Ct. at 1991; *Cohen's Handbook of Federal Indian Law* 34 ("[T]he intent of Congress, as elucidated by [Supreme Court decisions], was to designate as Indian country all lands set aside by whatever means for the residence of tribal Indians under federal protection, together with trust and restricted Indian allotments."). Indeed, the Tenth Circuit regards this factor as a sufficient measure of whether land is Indian country. *See Buzzard*, 992 F.2d at 1076 (noting the existence of § 1151, but applying only the "set apart for the use of Indians" test in determining whether land was Indian country).

■ The district court found that the housing site met this factor's criteria.

Although the United States does not hold title to the land and did not vest control over it in the Tribe, HUD has, in a manner of speaking, set the land apart for occupancy by elderly and low-income members pursuant to a need recognized both by HUD and the Tribe.

*Narragansett I*, 878 F.Supp. at 356. For the reasons discussed below, we disagree.

■ Our first question must be what constitutes setting land apart. As with the concept of dependent Indian communities, there is no established definition. Having surveyed the case law, however, we agree with the Tenth Circuit's suggestion that "land is 'validly set apart for the use of Indians as such' only if the federal government takes some action indicating that the land is designated for use by Indians." *Buzzard*, 992 F.2d at 1076 (quoting *Citizen Band Potawatomi Indian Tribe*, 498 U.S. at 511, 111 S.Ct. at 910 (quoting *John*, 437 U.S. at 649, 98

S.Ct. at 2549)). In other words, "[s]uperintendence by the federal government, and the consequential political dependence on the part of the tribe, exists for purposes of section 1151(b) where the degree of congressional and executive control over the tribe is so pervasive as to evidence an intention that the federal government, not the state, be the dominant political institution in the area." *Native Village of Venetie,* 1995 WL 462232, at *14. We do not find evidence of such control here.

■ Were the land placed in trust with the United States, this factor would have been met. Taking land in trust is a considered evaluation and acceptance of responsibility indicative that the federal government has "set aside" the lands.

> [T]rust land is set apart for the use of Indians by the federal government because it can be obtained only by filing a request with the Secretary of the Interior, who must consider, among other things, the Indian's need for the land, and the purposes for which the land will be used. If the request is approved, then the United States holds the land as trustee....
>
> ... In addition, before agreeing to acquire trust land, the Secretary must consider several factors including the authority for the transactions, the impact on the state resulting from the removal of the land from the tax rolls, and jurisdictional problems that might arise.

*Buzzard,* 992 F.2d at 1076 (citations omitted). Additionally, counsel for the Tribe admitted at oral argument that had the land been taken into trust by the United States, the issue of civil and criminal jurisdiction would have been addressed. The considerations made in the trust process demonstrate that "when the federal government agrees to hold land in trust, it is prepared to exert jurisdiction over the land." *Id.*

Indeed, we note that in three of the four cases we have found where a court held that a housing project constituted a dependent Indian community, the land was held in trust, with the participation of HUD and an Indian housing authority. *See United States v. Driver,* 945 F.2d 1410, 1415 (8th Cir.1991), *cert. denied,* 502 U.S. 1109, 112 S.Ct. 1209,

117 L.Ed.2d 448 (1992); *South Dakota,* 665 F.2d at 839; *U.S. v. Mound,* 477 F.Supp. 156, 158 (D.C.S.D.1979) In the fourth, *Housing Authority of the Seminole Nation v. Harjo,* Josephine Harjo inherited a restricted Indian allotment from her husband, also a Tribe member. In 1973 she partitioned four tracts from the larger tract and deeded them to the Seminole Housing Authority, as part of a federally-funded program whereby Harjo would make payments each month and, in seventeen years, would own the house and the land. Although the United States did not have title to the deeded lands, it continued its "superintendence" of the property for the seventeen years of the program, a role evident in the comprehensive federal regulations governing the program. 790 P.2d at 1101. Thus the court found that the government "controls virtually every foreseeable legal consideration touching the property until the [program] runs its course or sooner terminates." *Id.* at 1102. Although HUD regulations apply in the present case as well, the Tribe has pointed to no such comprehensive superintendence. Further, although the lands in *Harjo* were not held in trust, they were not purchased from third parties, as in the present case. Instead, they were originally part of Harjo's restricted Indian allotment, and the portions of the allotment she did not use remained restricted, a much closer link to government control then the Tribe demonstrates here.

In fact, we note that, aside from *Harjo,* the vast majority of cases we have found which analyze what constitutes a dependent Indian community since § 1151(b) was enacted find there is such a community if the land is held in trust, *Driver,* 945 F.2d at 1415; *Azure,* 801 F.2d at 339; *South Dakota,* 665 F.2d at 839; *Mound,* 477 F.Supp. at 158; or as settlement lands, *Youngbear v. Brewer,* 415 F.Supp. 807, 809 (N.D.Iowa 1976), *aff'd,* 549 F.2d 74 (8th Cir.1977). Similarly, in *Levesque,* we found a dependent Indian community where the land was held by a newly recognized Indian tribe as part of their reservation. *Levesque,* 681 F.2d at 78. On the other hand, we note that in most of the cases we found where land was privately held, even if by a tribe, the courts found there was not a dependent Indian com-

munity. *See Buzzard,* 992 F.2d at 1075 (involving land purchased by tribe); *Blatchford,* 904 F.2d at 548 (addressing privately held land surrounded by Navajo allotment land); *Weddell,* 636 F.2d at 213 (involving independent municipal corporation on former Indian reservation); *United States v. Oceanside Okla., Inc.,* 527 F.Supp. 68, 69 (W.D.Okla. 1981) (addressing land held in fee by non-Indians); *Native Village of Venetie,* 1995 WL 462232, at *15 (after settlement act extinguished aboriginal claims, fee held by Native Village of Venetie Tribal Government). *But see Martine,* 442 F.2d at 1023.[10] Thus the facts that the housing site is not held in trust or as settlement lands, and that the federal government does not exercise some similar level of control over the land, weigh against the Tribe.

The Tenth Circuit's analysis in *Buzzard v. Oklahoma Tax Commission* also weighs against finding the housing site meets the "set apart" requirement. In *Buzzard,* as here, the Indian tribe unilaterally purchased the lands in dispute, and held title to them in fee simple. Instead of housing, it set up commercial smokeshops on the land. The tribe claimed that the land was Indian country because it had been set apart by the federal government for the use of the Indians. In support of its position, it pointed to a clause in its charter and in 25 U.S.C. § 177 providing that land owned by a tribe cannot be disposed of without the approval of the Secretary of the Interior—a restraint on alienation that the Tribe acknowledges applies here as well. The *Buzzard* court rejected the tribe's argument, finding that a restriction on alienation by itself is insufficient to make the land Indian country.

> If the restriction against alienation were sufficient to make any land purchased by the [tribe] Indian country, the [tribe] could remove land from state jurisdiction and force the federal government to exert jurisdiction over that land without either sovereign having any voice in the matter. Nothing in *McGowan* or the cases concerning trust land indicates that the Supreme Court intended for Indian tribes to have such unilateral power to create Indian country.

992 F.2d at 1076. Of course, in the present case we have an additional element: HUD and BIA financial assistance and supervision of a housing project that is more clearly tied to the community's benefit than the smokeshops in *Buzzard.* Nonetheless, the court's concern in *Buzzard* with unilateral creation of Indian country remains a valid one in this case as well.

Ultimately, as in *Buzzard,* we find that the federal role in the WHA project is simply not sufficient to establish that the housing site was "set apart" by the federal government. Our analysis of the facts here, as well as the facts other courts have found determinative in deciding whether land has been "set apart," leads us to conclude that the district court's holding that the housing site had been set apart constituted an abuse of its discretion. *See Planned Parenthood League of Mass. v. Bellotti,* 641 F.2d 1006, 1009 (1st Cir.1981) noting that " 'misapplication of the law to particular facts is an abuse of discretion.' " (quoting *Charles v. Carey,* 627 F.2d 772, 776 (7th Cir.1980)).

We conclude that without this final factor being in place, we cannot find that the housing site is a dependent Indian community. *See Levesque,* 681 F.2d at 77 (stating that "whether the area was established for the use, occupancy and protection of dependent Indians" is the "ultimate issue" in our fact-based inquiry). While the first two factors we addressed support the Tribe's contention that the housing site is a community of Indians, the second two demonstrate that it is not a "dependent" one. Without federal ownership of the land, as required in the first *South Dakota* factor, or federal action sufficient to "set aside" the land, as required in

---

10. We note that in its brief discussion in *Martine,* the Tenth Circuit did not consider whether the lands had been "set apart." 442 F.2d at 1023–24. Later decisions in that circuit, however, have incorporated the *South Dakota* factors in their analysis. *See Watchman,* 52 F.3d at 1545 (adopting the *South Dakota* additions to the *Martine* list of factors); *see also Blatchford,* 904 F.2d at 544–49 (discussing development of the case law and conducting factual analysis). Indeed, in *Buzzard,* the court relied solely on the "validly set apart" definition of Indian country, eschewing analysis under section 1151. *Buzzard,* 992 F.2d at 1076–77.

**922**

the fourth, we cannot find on these facts that the "dependent" aspect of the concept of a dependent Indian community has been established. *See United States v. Adair,* 913 F.Supp. 1503, 1515 (E.D.Okla.1995) ("Although the government's retention of title ... or government title in trust for an Indian tribe, does not in and of itself establish an area as a "dependent" Indian community ..., without such title, consideration of the other ... factors should be unnecessary."); *Native Village of Venetie,* 1995 WL 462232, at *13 (noting that the question of whether there is federal superintendence "brings into play the 'dependent' component").

Put simply, it is too far a stretch to regard the government agency funding and oversight here as evidencing a federal intent to give the tribe presumptive sovereignty over the housing site by making it Indian country.[11] It seems implausible that a tribe could obtain a valid claim to Indian country—and thus presumptive sovereignty rights—over theretofore privately-held lands just by purchasing them and obtaining financial and other assistance from the government for their development, without any opportunity for involvement by the state, any negotiated agreements with respect to jurisdiction over the land, or considered analysis by the federal government such as the one described for the placement of lands in trust. Viewed more reasonably, the federal action here at best evidences an intent to assist in the development of affordable housing for use by Tribe members, without necessarily incurring a commitment to exercise jurisdiction and "superintendence" over all activities on that land, whether related to housing or not, to the presumptive exclusion of state laws.

### CONCLUSION

For the above reasons, we hold that the district court's denial of the request for a permanent injunction insofar as it was based on the plaintiffs' failure to comply with the requirements of any State regulations promulgated pursuant to the Historic Preservation Act, the Clean Water Act, the Safe Drinking Water Act and those provisions of the Rhode Island building code and Charlestown Zoning Ordinance is *reversed,* and the district court shall enter an order granting the injunction. The district court's grant of the request for a permanent injunction of plaintiffs from occupying or permitting occupation of any buildings constructed or to be constructed on the housing site unless and until all applicable requirements of Rhode Island's Coastal Resources Management Program have been satisfied and from interfering with the drainage easement previously conveyed to the Town of Charlestown is *affirmed.*

---

11. Indeed, outside of the context of tribal disputes, the granting of a HUD subsidy to a housing project would not be viewed as evidence of a federal intention to preempt the operation of all other state laws.