[EDITOR'S NOTE: This case is unpublished as indicated by the issuing court.] MEMORANDUM OF DECISION
Motion To Dismiss
The defendant is charged with Sexual Assault in the First Degree, C.G.S. § 53a-70; and Risk of Injury To A Minor, C.G.S. § 53-21. These crimes are alleged to have occurred on April 11, 1996 at defendant's residence, 67 Coachman Pike, Ledyard, Connecticut.
The defendant was arrested on May 21, 1996.
Thirteen months after his arrest, defendant filed a Motion To CT Page 9330 Dismiss wherein he claimed —
 "[t]his court lacks jurisdiction over the offenses charged, over the person of the Defendant and over the subject matter of these charges." Motion To Dismiss, July 3, 1997.
The motion did not set forth the basis for the claim(s).
Three and a half months later, defendant filed a brief regarding the motion to dismiss. It states:
 "The Defendant respectfully submits that this court lacks jurisdiction and that the charges pending against the Defendant for two separate reasons. [Sic] First, the State of Connecticut was granted jurisdiction over only those crimes occurring between Indians on the Mashantucket Reservation. Therefore, the State lacks jurisdiction over this crime which took place off the Reservation but in Indian country. Second, because the Federal Government maintains exclusive jurisdiction over those crimes listed in the Major Crimes Act (18 U.S.C. § 1153), the State lacks jurisdiction over the crimes charged in the Information." Defendant's Memorandum of Law In Support of His Motion To Dismiss, October 23, 1997, p. 3.
Some background information is necessary for an understanding of defendant's claim. Defendant says he "is a member of the Mashantucket Pequot Indian Tribe." Defendant's Memorandum of Law In Support Of His Motion To Dismiss, October 23, 1997, p. 2. Defendant also states the place where his criminal acts are alleged to have occurred, that is "67 Coachman Pike, is located in a dependent Indian community and is therefore in Indian country." Id @ 7. Defendant attempts to apply the Indian Major Crimes Act to his situation.[1]
Our Supreme Court has stated:
 "At the outset, we note that criminal offenses committed by or against Indians in `Indian country' ordinarily `have been subject only to federal or tribal laws, Moe v. Salish Kootenai Tribes, 425 U.S. 463, 96 S.Ct. 1634, 48 L.Ed.2d 96 [1976], except where Congress in the exercise of its plenary and exclusive power over CT Page 9331 Indian affairs has "expressly provided that State laws shall apply." McClanahan v. Arizona State Tax Commission, 411 U.S. 164, 170-71, 93 S.Ct. 1257, 36 L.Ed.2d 129 [1973].' Washington v. Yakima Indian Nation, 439 U.S. 463, 470-71, 99 S.Ct. 740, 58 L.Ed.2d 740 (1979); see Worcester v. Georgia, 31 U.S. (6 Pet.) 515, 8 L.Ed. 483 (1832).[6]" [Footnote omitted.] State v. Spears, 234 Conn. 78, 84-5 (1995).
 "[6] Congress has conferred on the federal courts special criminal jurisdiction over offenses committed in Indian country. See Negonsott v. Samuels, ___ U.S. ___, 113 S.Ct. 1119, 1121-22, 122 L.Ed.2d 457 (1993). The Indian Country Crimes Act, codified at 18 U.S.C. § 1152, applies to crimes committed by non-Indians against Indians and to crimes committed by Indians against non-Indians not encompassed by other statutes or prosecuted in a tribal court. See Williams v. United States, 327 U.S. 711, 714, 66 S.Ct. 778, 90 L.Ed. 962 (1946); F. Cohen, Handbook of Federal Indian Law (1982 Ed.) pp. 287-300. The Indian Major Crimes Act establishes as federal crimes certain felonies committed by any Indian in Indian country `against the person or property of another Indian or other person . . . .' 18 U.S.C. § 1153, 3242. In the absence of an express grant of state jurisdiction by Congress, state jurisdiction within Indian country `is limited to crimes by non-Indians against non-Indians . . . and victimless crimes by non-Indians.' Solem v. Bartlett, 465 U.S. 463, 465 n. 2, 104 S.Ct. 1161, 79 L.Ed.2d 443, reh. denied, 466 U.S. 948, 104 S.Ct. 2148, 80 L.Ed.2d 535 (1984)." State v. Spears, 234 Conn. 78, 85, fn. 6 (1995).
To succeed in his invocation of the Indian Major Crimes Act, defendant must show that: (1) the crimes he is charged with come within the Indian Major Crimes Act, (2) he is a member of a federally recognized tribe, (3) the alleged victim is a member of a federally recognized tribe, (4) the alleged criminal acts occurred in "Indian country," and (5) the United States has not ceded criminal jurisdiction to the State of Connecticut over that particular Indian country.
The defendant acknowledges that he has the burden of proof on the matters at issue on his motion. Tr. 12/11/97 p. 6.
The State concedes that the charges against the defendant CT Page 9332 come within the Indian Major Crimes Act if they were committed in Indian country. Tr. 12/11/97 p. 5. The parties stipulated in open court that both the defendant and the alleged victim are members of the Mashantucket Pequot Indian Tribe. Tr. 12/11/97 p. 8. The Mashantucket Tribe was federally recognized as of October 18, 1983. See Mashantucket Pequot Indian Claims Settlement Act [Settlement Act], Public Law 98-134, October 18, 1983;25 U.S.C. § 1751-1760. The Settlement Act states specifically that "Federal recognition is extended to the [Mashantucket Pequot] Tribe." See § 9(a); 25 U.S.C. § 1758 (a).
In the Settlement Act, Congress provided:
 ". . . the reservation of the Tribe is declared to be Indian country subject to State jurisdiction to the maximum extent provided in Title IV of [the Indian Civil Rights] Act [25 U.S.C. § 1321 et seq.]" Settlement Act, § 6, 25 U.S.C. § 1755.
Thus, the very same section which declared the Mashantucket Pequot Reservation Indian country also expressly granted the State of Connecticut full criminal and civil jurisdiction over the reservation. See also State v. Spears, 234 Conn. 78 (1994) and Charles v. Charles, 243 Conn. 255 (November 18, 1997).[2]
The heart of defendant's claim is that while his alleged crimes did not occur on the Reservation, nevertheless it did occur within "Indian country."
"Indian country" is a statutory term.
"Indian country" includes
 "(a) all land within the limits of any Indian reservation under the jurisdiction of the United States Government, notwithstanding the issuance of any patent, and, including rights-of-way running through the reservation, (b) all dependent Indian communities within the borders of the United States whether within the original or subsequently acquired territory thereof, and whether within or without the limits of a state, and (c) all Indian allotments, the Indian titles to which have not been extinguished, including rights-of-way running through the same." [Italics added.] 18 U.S.C. § 1751. CT Page 9333
The defendant relies on subsection (b) of § 1751 relating to "dependent Indian communities." Defendant claims:
 "The Defendant's home, which is located at 67 Coachman Pike, is located in a dependent Indian community and is therefore in Indian country." Defendant's Memorandum of Law In Support Of His Motion To Dismiss, October 23, 1997, p. 7.
The issue here is whether 67 Coachman Pike is within a "dependent Indian community." The court heard evidence and argument on this issue on December 11, 12, and 19, 1997; it was also briefed. The parties were at issue on the legal test to be used in determining whether the area in question was a "dependent Indian community" and on the facts regarding the area of 67 Coachman Pike.
After the parties were heard on December 19, 1997, the court denied the defendant's Motion to Dismiss stating:
 THE COURT: Well, I'm denying the motion. One, I think the court's bound by Schaghticoke test. And the defendant I believe acknowledges, which I appreciate his candor, he couldn't pass the test. I think that's the test binding upon me but I also have applied the conglomerate test — the test of Cook, Narragansett, Martine, South Dakota. There must be a dozen or at least a dozen — Venetie, which was argued the other day in the Supreme Court.[3]
 I don't think the defendant has established dependent Indian community under those. The court questions whether there's even a community, and somewhat telling on the court's decision is the fact that I haven't had one ounce of evidence that any federal agency even knows that this community — claimed dependent Indian community even exists. Yes, it's part of the settlement lands but I don't know that there's any evidence before me that any federal agency knows of this claimed community as a community or as a dependent Indian community.
 If necessary I'll prepare detailed findings. Page 9334
Transcript, December 19, 1997, p. 254-5.
Since the defendant has appealed, the court sets forth herein its reasons for denying the defendant's Motion To Dismiss in more detail than it had in its oral ruling made on December 19, 1997.[4]
 THE CLAIMED DEPENDENT INDIAN COMMUNITY
On the first day of the hearing, December 11, 1997, the court directed the defendant to define the territorial limits of the "claimed dependent Indian community." A portion of Exhibit 1 was copied.[5] It showed the land ownership in the area of the Reservation and the "claimed dependent Indian community," i.e, whether the land was owned by the Tribe in fee, by non-Indians, or by the United States in trust for the Tribe. Defendant's counsel described the area of the "claimed dependent Indian community" with a yellow highlighter. Tr. 21, 26. The map thus describing the "claimed dependent Indian community" became Exhibit 3.[6] On the last day of the hearing, December 19, 1997, the defendant asked to enlarge the area of the "claimed dependent Indian community" by adding thereto Parcel 32 on Exhibit 3. Exhibit 3 was then changed by highlighting Parcel 32 in yellow. Exhibit 3 now represents what defendant claims to be the "claimed dependent Indian community;" i.e. what he claimed on December 11, 1997 and as augmented by his claim made on December 19, 1997.
There is no evidence of when the "claimed dependent Indian community" allegedly became a "dependent Indian community." The court has the distinct impression that the "claimed dependent Indian community" was being formed as the case progressed.
The defendant acknowledged that the "claimed dependent Indian community" had not been defined before December 11, 1997. Tr. 25.
The "claimed dependent Indian community" lies within the Stonehenge subdivision in Ledyard. Stonehenge has been in existence since at least 1980. It was subdivided and developed by the McBrides. The McBrides are not Indians. The Stonehenge subdivision long predates the Mashantucket Pequot Tribe's property acquisitions which fathered defendant's claims.
The "claimed dependent Indian community" does not have a name. Tr. 141. CT Page 9335
There are no visible indications which distinguish the area as being an Indian community or a dependent Indian community. Tr. 142-143.
The total area of the "claimed dependent Indian community" is only 30-40 acres overall. Tr. 142, Exhibits 1 and 3.
Coachman Pike is a town road in the Stonehenge subdivision in Ledyard. A portion of it lies in the "claimed dependent Indian community" where it runs generally in an east-west direction. It is only 2200 feet in length within the "claimed dependent Indian community."
The core of the "claimed dependent Indian community" consists of 16 or 17 residential properties fronting on Coachman Pike owned by the Tribe.[7]
These properties were purchased by the Tribe with Tribal monies. Two were purchased in late 1991 and one in 1992. Eleven were purchased in 1993. One was bought on May 29, 1996. It is not clear when the other three or four were purchased. For the purposes of deciding this motion, the court will assume that 17 properties fronting on Coachman Pike within the "claimed dependent Indian community" were owned by the Tribe as of April 11, 1996. Four were then owned and occupied by non-Indians. No governmental funding was involved in these purchases. The Tribe has not taken any federal funds for housing purposes since 1991. Tr. 105. Several of the properties are subject to substantial mortgages to various local banks. These mortgages were placed on the properties at the time of the Tribe's purchases. The Tribe bought, and continues to try to buy, area properties on the open market.
The deeds show what the Tribe paid for the Coachman Pike properties. The prices paid were $340,000, $365,000, $370,000, $310,000, $369,000, $317,000, $330,000, $290,000, $350,000, $380,000, $350,000, $365,000, $340,000, $318,000, $285,000, and $320,000.[8] The lot sizes were all over an acre; at least nine were in excess of 1.5 acres. Exhibits 5, 7, 8, 9, 10, 11, 16, 18, 19, 20, 21, 22, 24, 25, 26, and 28. The Tribe did not scrimp in providing this housing.
All these Tribe-owned properties were owned and occupied by non-Indians before the Tribe acquired them. 154, 254. CT Page 9336
Each of the several residential properties on Coachman Pike owned by the Tribe is occupied by an adult Tribe member and his/her household. Most, if not all, of these adult Tribe members were working for the Tribe or Tribe enterprises on the Reservation. As of April 1996, there were approximately 50 Tribe members living in the Tribe's 17 Coachman Pike properties in the "claimed dependent Indian community." Tr. 106
There has been no evidence about the relatively large, unnumbered, irregularly shaped (upside down L) parcel on the south side of Coachman Pike which lies between parcels 38 and 52. There was some evidence about the far larger, unnumbered tract which lies south of the parcel just described, and parcels 52, 54, 56, 58, 60, 64, 66, and Coachman Pike, and is bounded on the east by Shewville Road, on the south by the northerly boundaries of parcels 875 and 879, partly by each, and on the west by the boundary of the "settlement lands" described in the Settlement Act. See Exhibit 3, Exhibit 1. It is vacant, is zoned single-family and has some wetlands on it which pose some concern. The Tribe has some plans to build five single family houses there. Development of this parcel must be done in accordance with State and Ledyard regulations. Tr. 144-5. This land was bought with Tribal funds; there is no evidence as to when the Tribe acquired it. The evidence is thin to non-existent on whether it had been owned by the Tribe as of April 1996.
And further, there has been no evidence about parcel 899 which lies immediately west of Shewville Road and east and north of parcel 67. The court has no information whatsoever about this land except it appears to comprise a large part of the area of the "claimed dependent Indian community."
Parcel 38 lies partly within the "claimed dependent Indian community." Part of it is outside the "claimed dependent Indian community" and also outside the boundaries of the "settlement lands." Exhibit 1. It was purchased by the Tribe in June 1993 for $365,000. The Tribe has had a child care facility (Child Advocacy Center) on the property; it was there before the Tribe began acquiring the residential properties on Coachman Pike. This facility provides temporary care for children of Tribe members who need to be removed from their homes. Money for the services rendered there is furnished by the Tribe.
Parcel 32 is the historic tribal burial ground or cemetery. The State of Connecticut, apparently acting pursuant to the CT Page 9337 federal Settlement Act and the State counterpart,[9] conveyed parcel 32 to the Tribe in November 1984. Exhibit 15. It was taken into federal trust soon after federal recognition of the Tribe. Tr. 181. It is a part of the Reservation by virtue of section 3 (7) of the Settlement Act. 25 U.S.C. § 1752 (7). How it can also be part of a "dependent Indian community" distinct from the Reservation has gone unexplained by the defendant.
The 17 residential properties owned by the Tribe which front on Coachman Pike and Parcel 38 were purchased by the Tribe on the open market from non-Indians over the period 1992 to 1996. As stated, the State of Connecticut conveyed parcel 32 to the Tribe in 1984 and thereafter was taken into trust by the United States. There is no evidence of how, when, or from whom the other lands within the "claimed dependent Indian community" were acquired.
All of the land in the "claimed dependent Indian community" was a part of an Indian reservation which had been established in the mid 1600's. In approximately 1790, the State of Connecticut took some 800 acres of that reservation and gave it to settlers. The "claimed dependent Indian community" is within the 800 acres taken in approximately 1790 and given to settlers. Tr. 176, 179-182.
Tribe members, including those living in the "claimed dependent Indian community" are eligible for many services and benefits through the Tribe. These include health services, including a clinic, education, and fitness; adult education; in-school counseling; tutorial services; child care; recreational activities; and cultural activities. Federal policy permits the Tribe to provide services to all its members living on or near the Reservation. The Tribe, not the federal government, provides these services. Tr. 58, 59, 103, 104, 105. The Tribe operates a health clinic for its members and members of all federally recognized tribes within New London County. The health clinic is not located within either the "claimed dependent Indian community" or the Reservation. It is located on either Parcel 75 or 85 on Route # 2 west of the original Reservation. See Exhibit 1. At least part of the funding for these health services is furnished by Indian Health Services, a federal agency. Tr. 104.
Much social activity takes place on the Reservation. This includes family gatherings, community get-togethers, quarterly tribal meetings, swimming classes, etc. All these tribal activities are open to the residents of the "claimed dependent CT Page 9338 Indian community." Most of these services are actually furnished in facilities located on the Reservation. Tr. 119. None of these services or benefits are furnished within the "claimed dependent Indian community" except those provided at the child care facility located on Parcel 38. There is no evidence that any person living in the "claimed dependent Indian community" has ever used that child care facility. The persons living in the "claimed dependent Indian community" would be eligible to use that facility if the need arose, not because of their living within the "claimed dependent Indian community," but because of their Tribal membership.
There is no evidence that any deceased resident of the "claimed dependent Indian community" was buried in the burial ground on parcel 32. While deceased residents of the "claimed dependent Indian community" probably can be buried in the burial ground, that is not because of their living in the "claimed dependent Indian community," but rather because of their having been members of the Tribe.
The Tribe pays real estate taxes to the Town of Ledyard on the Tribe's properties in the "claimed dependent Indian community."[10]
Governmental services provided in the "claimed dependent Indian community" are primarily those from the Town of Ledyard. Coachman Pike is owned by the Town. It is maintained by the Town. Snow removal, sanding and the like are provided by the Town. Children living in the "claimed dependent Indian community" go to the Ledyard Public Schools. The area is subject to Ledyard zoning. Building, including the issuance of building permits, is regulated by Ledyard. Fire protection is afforded by Ledyard. Ledyard police have police authority in the area.[11] Emergency services such as ambulance and EMT services are provided by Ledyard. Calls from the "claimed dependent Indian community" for 911 are answered by a service center provided by Ledyard. Dogs owned by residents must be licensed in Ledyard. Residents of the "claimed dependent Indian community" are entitled to vote in Ledyard in town, State and national elections.
Residents of the "claimed dependent Indian community" are subject to State laws. To operate a motor vehicle, they must have a license issued by the Connecticut Department of Motor Vehicles. Similarly, their automobiles must be registered with the Connecticut Department of Motor Vehicles. They are subject to CT Page 9339 call for jury duty in the State and federal courts.
Residents of the "claimed dependent Indian community" are entitled to all the services and benefits afforded by the Town of Ledyard to its residents. Similarly, the residents of the "claimed dependent Indian community" are entitled to all the services and benefits afforded by the State of Connecticut to its residents.
All of the "claimed dependent Indian community" lies within the "settlement lands." Exhibits 1 and 3. The Tribe has applied to the federal Bureau of Indian Affairs to have the 17 residential properties it owns on Coachman Pike and Parcel 38 taken into trust for the Tribe. Parcel 32, the ancient burial ground, is held in trust for the benefit of the Tribe. There is no evidence in the record that the Tribe has applied for trust status for any of the other land in the "claimed dependent Indian community."[12]
Defendant called the Tribe's tribal manager as a witness. He testified extensively. By experience and training, he is very knowledgeable about federal policies regarding Indians and Indian lands. He testified, and the court accepts his testimony, "that the Bureau [of Indian Affairs] will not take land into trust if there were encumbrances on the land." Tr. 139.
There are no stores, churches, schools or commercial establishments in the "claimed dependent Indian community." There are no facilities for public assembly in the "claimed dependent Indian community."
There is no evidence that any of the land in the "claimed dependent Indian community" has ever been owned by the federal government. With the exception of Parcel 32, the ancient tribal burial ground, none of that land is held in trust, or any like status, by the United States for the Tribe. There is no evidence that any federal agency recognizes the "claimed dependent Indian community" as a dependent Indian community. There is no evidence that any federal agency has ever taken any action or expended any funds for the "claimed dependent Indian community."
The record does not show that the residents of the "claimed dependent Indian community" have ever taken any action indicative of a community. While the residents may take part in Tribal communal activities on the Reservation, there is no evidence that CT Page 9340 they have acted communally in, or with respect to, the smaller "claimed dependent Indian community." Other than providing the residents a place to live, there is no evidence the residents of the "claimed dependent Indian community" get any services by virtue of their living in the "claimed dependent Indian community" or act communally or otherwise interact among themselves as a community distinct from the Tribe. Such community of interest the residents have is that of Tribe members, there is nothing that draws them together communally as residents of the "claimed dependent Indian community." The record does not even show they even have shared something as simple as a neighborhood picnic.
 THE TEST FOR "DEPENDENT INDIAN COMMUNITY"
The term "dependent Indian country" is not defined by statute. The Supreme Court of Connecticut has stated that "18 U.S.C. § 1151 (b) is inherently ambiguous because it fails to define the term `dependent Indian community.'" SchaghticokeIndians of Kent, Conn. Inc. v. Potter, 217 Conn. 612, 620 (1991). Several courts have interpreted it.
Defendant has not been consistent regarding the test the court should use in making the "dependent Indian community" determination. Defendant's original motion papers urged this court to use the test used in United States v. Cook,922 F.2d 1026 (2 Cir. 1991). Defendant's Memorandum Of Law In Support Of His Motion to Dismiss, October 23, 1997, p. 7. At the beginning of the hearing on defendant's motion, defendant told the court: "We intend to rely on the test provided in Schaghticoke Indiansof Kent, Connecticut versus Potter at 217 Connecticut 612." Tr. (12-11-97) p. 2. Later, in a supplemental brief filed on the third day of the hearing, defendant again advocated use of theSchaghticoke test. Defendant's Reply To Brief In Opposition To Defendant's Motion To Dismiss, December 10, 1997, pp. 7-8. Then the defendant filed a brief saying "[t]he Defendant urges this Court to apply the three-part test in United States v. Cook, 922
F.2d 1026 (2d Cir. 1991)." Defendant's Reply To Brief In Opposition To Defendant's Motion To Dismiss, December 12, 1997, p. 8. At the last call, defendant again asked the court to use the United States v. Cook test. Tr. 243.
The State urged the court to adopt the test used by the United States Court of Appeals For The First Circuit inNarragansett Indian Tribe v. Narragansett Electric Co., CT Page 934189 F.3d 908 (1st Cir. 1996).
The court used the tests set forth in Schaghticoke/Dana,United States v. Cook, and Narragansett Indian Tribe v.Narragansett Electric Co. The court also used the tests used by the western circuits, i.e. the Eighth, Ninth, and Tenth Circuits' Courts of Appeals. United States v. Azure, 801 F.2d 336 (8 Cir. 1986), United States v. State of South Dakota, 665 F.2d 837 (8 Cir. 1981), cert. denied, 459 U.S. 823 (1982), Yukon Flats SchoolDistrict v. Venetie Tribal Government, 101 F.3d 1286 (9 Cir. 1996),[13] United States v. Adair, 111 F.3d 770 (10 Cir. 1997),Pittsburgh Midway Coal Mining Company v. Watchman, 52 F.3d 1531
(10 Cir. 1995), Blatchford v. Sullivan, 904 F.2d 542, 547 (10 Cir. 1990), cert. denied, 498 U.S. 1035 (1991), and, UnitedStates v. Martine, 442 F.2d 1022 (10 Cir. 1971).
By any of the tests, the defendant's evidence did not establish a "dependent Indian community."
 Schaghticoke Indians of Kent, Conn. Inc. v. Potter
The Supreme Court of Connecticut adopted a test for determining whether a particular area is a "dependent Indian community." That is the "test set out in State v. Dana,404 A.2d 551 (Me. 1979), cert. denied, 444 U.S. 1098. 100 S.Ct. 1064,62 L.Ed.2d 785 (1980)." Schaghticoke Indians of Kent, Conn. Inc. v.Potter, 217 Conn. 612, 618-619 (1991).
 "In State v. Dana, supra, 562, the Supreme Court of Maine defined a dependent Indian community as `Indian country' if, (1) there is a bona fide tribe of Indians, and (2) the tribe has inhabited the land, has had "Indian title" to it since 1790, and has maintained the same status and nature of its occupancy from 1790 to the time the cause of action arose. We agree with the Appellate Court that the Dana test is the relevant standard." [Footnote omitted.] Schaghticoke, 620.[14]
Our Supreme Court opted not to use a test substantially similar to that used in Cook. Schaghticoke Indians of Kent, Conn.Inc. v. Potter, 217 Conn. 612, 618-20 (1991).
Schaghticoke was a civil matter. This is a criminal case. The difference is inconsequential. The jurisdictional definitions contained in 18 U.S.C. § 1751 are "applicable in both CT Page 9342 criminal and civil contexts. See, e.g., California v. CabazonBand of Mission Indians, 480 U.S. 202, 207, 107 S.Ct. 1083,94 L.Ed.2d 244 (1987)." Sebastian, 243 Conn. @ 129, fn. 22.
It appears that the Dana/Schaghticoke test was still the operative test for determining "dependent Indian community." As a trial court, this court is bound by Connecticut Supreme Court precedent; especially when so recently the Supreme Court expressly declined to take the route now urged upon this trial court.[15]
As a matter of law, the "claimed dependent Indian community" could not be a "dependent Indian community" under theDana/Schaghticoke test. That test has two parts: "(1) there is a bona fide tribe of Indians, and (2) the tribe has inhabited the land, has had `Indian title' to it since 1790, and has maintained the same status and nature of its occupancy from 1790 to the time the cause of action arose." Schaghticoke, 217 Conn. 612, 620. The court presumes the first or "bona fide tribe of Indians" part has been satisfied by virtue of section 9(a) of the Settlement Act.25 U.S.C. § 1758 (a).[16]
But the Settlement Act negates establishment of the second part. The second part requires the tribe's inhabiting, or having Indian title to, the land since 1790 in the same way from 1790 to the time the cause of action arose. Here, the court holds the "cause of action arose" on April 11, 1996, the date of the alleged offenses. The Settlement Act states:
 "Any transfer before October 18, 1983, from, by, or on behalf of the Tribe or any of its members of land or natural resources located anywhere within the United States, and any transfer before October 18, 1983, from, by or on behalf of any Indian, Indian nation, or tribe or band of Indians of land or natural resources located anywhere within the town of Ledyard, Connecticut, shall be deemed to have been made in accordance with the Constitution and all laws of the United States, including without limitation the Trade and Intercourse Act of 1790, Act of July 22, 1790 (ch. 33, Sec. 4, 1 Stat. 137, 138), and all amendments thereto and all subsequent reenactments and versions thereof, and Congress hereby does approve and ratify any such transfer effective as of the date of said transfer." Settlement Act, § 4(a), 25 U.S.C. § 1753 (a). CT Page 9343
 "By virtue of the approval and ratification of a transfer of land or natural resources effected by subsection (a), any aboriginal title held by the Tribe or any member of the Tribe, or any other Indian, Indian nation, or tribe or band of Indians, to any land or natural resources the transfer of which was approved and ratified by subsection (a) shall be regarded as extinguished as of the date of transfer." Settlement Act, § 4(b), 25 U.S.C. § 1753 (b).
The land of the "claimed dependent Indian community" was purchased from private owners. Even if these lands had originally belonged to Indians, the conveyance(s) or transfer(s) from the Indians to the predecessors in title of the private owners who sold to the Tribe have been validated by Congress in subsection 4 of the Settlement Act. Thus, any "Indian title" to the land was extinguished when originally conveyed or transferred by any Indian nunc pro tunc by the Settlement Act. Indians had not inhabited this land for some time prior to October 18, 1983, the date of the Settlement Act. Nor had Indians inhabited that land from that date until the Tribe bought the land in the 1990's. Clearly, it cannot be found that the Tribe "has maintained the same status and nature of its occupancy from 1790 to the time the cause of action arose," here, the alleged date of the offenses, April 11, 1996.
Any pre-Settlement Act (before October 18, 1983) land transfer of land in Ledyard by an Indian transferor was validated nunc pro tunc by the Settlement Act. Any claims of aboriginal title or "Indian title" regarding land in Ledyard have been extinguished by the Act. It must be conceded non-Indians owned and inhabited the properties located within the claimed "dependent Indian community" both before and after October 18, 1983.
With respect to the "claimed dependent Indian community," the Settlement Act prevents any finding or conclusion that "the tribe has inhabited the land, has had `Indian title' to it since 1790, and has maintained the same status and nature of its occupancy from 1790 to the time the cause of action arose." Schaghticoke,
217 Conn. @ 620.
Other evidence introduced by the defendant shows he cannot satisfy Schaghticoke. The Tribe's archaeologist-anthropologist CT Page 9344 testified the land on which the "claimed dependent Indian community" stands had been part of an Indian reservation prior to 1790. In approximately 1790, 800 acres of that reservation land was taken from the reservation and given to settlers. The "claimed dependent Indian community" is within that 800 acres. Tr. 12/19/97 pp. 178-180, 182-183. The court accepts this testimony as true. It negates any claim that the Tribe inhabited this land since 1790 in the same way it had prior to 1790.
During oral argument, defendant conceded that he could not prevail under Schaghticoke Indians of Kent, Conn. Inc. v. Potter,217 Conn. 612 (1991). Tr. 12/19/97 p. 244.
The defendant did not, indeed could not, establish that 67 Coachman Pike, Ledyard, Connecticut, was located in a dependent Indian community under the test of Schaghticoke Indians of Kent,Conn. Inc. v. Potter, 217 Conn. 612 (1991).
 United States v. Cook United States v. Cook, 922 F.2d 1026 (2 Cir. 1991), involved convictions for "the use and possession of gambling devices in Indian country under 15 U.S.C. § 1575." 922 F.2d @ 1029. Defendant claimed his activities did not occur in Indian country. The court found that the conduct occurred in a dependent Indian community. The court stated the principles to be applied:
 "To determine whether a particular Indian tribe is a dependent community, it is necessary to examine the (1) nature of the area; (2) the relationship of the inhabitants in the area to the Indian tribes and the federal government; and (3) the established practice of government agencies toward that area. United States v. Martine, 442 F.2d 1022, 1023-24 (10th Cir. 1971); see State of Alaska v. Native Village of Venetie, 856 F.2d 1384, 1390-91 (9th Cir. 1988); United States v. Azure, 801 F.2d 336, 338-39 (8th Cir. 1986); United States v. Levesque, 681 F.2d 75, 77-78 (1st Cir.), cert. denied, 459 U.S. 1089, 103 S.Ct. 574, 74 L.Ed.2d 936 (1982). "The phraseology in issue thus seems intended to afford federal criminal jurisdiction over [offenses] committed by Indians in communities which . . . are both `Indian' in character and federally dependent." Levesque, 681 F.2d at 77. United States v. Cook, 922 F.2d 1026, 1031
(1991).
CT Page 9345
The six-mile tract of land in question had been established by treaty of the United States, the State of New York, and the St. Regis Mohawks, for occupancy by the St. Regis Mohawks. The St. Regis Mohawks Tribe is federally recognized. The BIA provides the Tribe with monies for education, housing, training programs, social services and administration of the tribal government. "[T]he BIA is involved in the planning and funding of roads within the reservation and is charged with maintaining the integrity of the lands and resources." Cook, @ 1031. The Second Circuit held that was ample to properly conclude that the area was a dependent Indian community. Id.
There are no parallels with the facts in Cook and the "claimed dependent Indian community." There is nothing in the record in this case which comes near to showing any degree of federal involvement with the "claimed dependent Indian community." The facts here are far from even approaching those found in Cook regarding a "dependent Indian community."
The defendant did not establish a "claimed dependent Indian community" under the factors and considerations stated and shown in United States v. Cook, 922 F.2d 1026 (1991).
 Narragansett Indian Tribe of Rhode Island v. Narragansett Electric Company 89 F.3d 908 (1 Cir. 1996)
This case involved a proposed 50-unit housing complex for the Tribe's elderly and low-income members. The 32 acre site was purchased by the Tribe's housing authority (WHA) from a private owner. The land was in a single family residential zone which required a minimum lot size of two acres. The land is not within the settlement lands set forth in the federal act by which the Narragansett Tribe was recognized and its land claims settled. HUD provided the financing for the site purchase and will finance the construction of the buildings. HUD will provide money for project management and for rent subsidies.
"The WHA bought the land, and then conveyed it to the Tribe. A deed restriction requires that the land be placed in trust with the federal government, for the express purpose of providing housing for tribal members. The . . . Tribe had applied for trust status, but that the application had not yet been granted. Meanwhile, the land has been leased to the WHA, with the approval CT Page 9346 of the Bureau of Indians Affairs (`BIA')." 89 F.3d 908, 911.
The WHA began construction without a building permit from the town and without State approval of the sewage disposal system. Other determinations or approvals were not obtained. The State of Rhode Island and the Town of Charlestown seek to enjoin the project unless the requisite permits and approvals are obtained from the State and Town. The Tribe claims the site is "Indian Country," i.e., a "dependent Indian community," and thus immune from State and/or Town control and regulation.
The site is across a road from other tribal land where the Tribe's long house (where the Tribal Assembly meets) and church are located. The Tribe's administrative offices are located in close proximity to the housing site. The Tribe proposes to build a community center and health center on settlement lands. The site "is close to the `center of tribal government, culture and religious life.'" Narragansett, 89 F.3d at 918.
The district court held the site was a "dependent Indian community." It refused injunctive relief.
The First Circuit reviewed the law on the meaning of "dependent Indian community."
 ". . . Exactly what constitutes a "dependent Indian community," however, has not been defined. Instead, courts addressing the question conduct "a functional inquiry into the nature of the community," weighing a series of factors established by case law. Levesque, 681 F.2d at 77.
 "While we have not previously faced the precise issue raised here, in United States v. Levesque we addressed whether a region is a dependent Indian community for the purposes of criminal jurisdiction, framing our focus in terms of whether the land is "both `Indian' in character and federally dependent." See id. at 77. In that case, we applied the factors set out by the Tenth Circuit in United States v. Martine, 442 F.2d 1022 (10th Cir. 1971), namely:
 the nature of the area in question; the relationship of the inhabitants of the area to Indian Tribes and the federal CT Page 9347 government, and the established practice of government agencies toward the area.
 Id. at 1023 (drawing factors from the discussion in Sandoval, 231 U.S. at 45-49). Other cases determining whether an area constitutes a dependent Indian community, including Tenth Circuit decisions, have relied on additional factors introduced into the case law by the Eighth Circuit in United States v. South Dakota, 665 F.2d 837 (8th Cir. 1981). See, e.g., Watchman, 52 F.3d at 1545 (adopting the South Dakota additions to the Martine list of factors); Blatchford v. Sullivan, 904 F.2d 542, 547 (10th Cir. 1990), cert. denied, 498 U.S. 1035 (1991); United States v. Azure, 801 F.2d 336, 339 (8th Cir. 1986); Housing Auth. of the Seminole Nation v. Harjo, 790 P.2d 1098, 1100 (Okla. 1990). Following their lead, we shall expand upon our discussion in Levesque to incorporate the South Dakota factors. See Martine, 442 F.2d at 1024 (noting that additional relevant factors may be considered).
 "Thus, our first factor is "whether the United States has retained `title to the lands which it permits the Indians to occupy' and `authority to enact regulations and protective laws respecting this territory.'" South Dakota, 665 F.2d at 839 (quoting Weddell v. Meirhenry, 636 F.2d 211 (8th Cir. 1980), cert. denied, 451 U.S. 941 (1981)). The second South Dakota factor encompasses the Martine factors, set out above. Id. Our third consideration is "whether there is `an element of cohesiveness . . . manifested either by economic pursuits in the area, common interests, or needs of the inhabitants as supplied by that locality.'" Id. (quoting Weddell, 636 F.2d at 212-13). The final South Dakota factor asks "`whether such lands have been set apart for the use, occupancy and protection of dependent Indian peoples.'" Id. (quoting Weddell, 636 F.2d at 213). Roughly speaking, the second and third factors weigh whether there is, in fact, an Indian community, and the first and fourth whether it is a dependent one. We accordingly address them in that order, ultimately concluding that the facts reveal that the housing site is not a dependent Indian community." Narragansett Indian Tribe v. Narragansett Electric Co., 89 F.3d 908, 917 (1st Cir. 1996).
CT Page 9348
The Court reviewed the various considerations and factors in some depth. It held the crucial factor was whether the land "has been set apart by the federal government for the use, occupancy, and protection of dependent Indian peoples." Narragansett,89 F.3d at 919. The Court held: "`land is "validly set apart for the use of Indians as such" only if the federal government takes some action indicating that the land is designated for use by Indians.'" [Citations omitted.] Narragansett, 89 F.3d at 919.
 "The last factor we address is whether the housing site has been set apart by the federal government for the use, occupancy, and protection of dependent Indian peoples. This proves to be the crucial factor in our discussion. See Levesque, 681 F.2d at 77 (noting that this is the "ultimate issue" in the factual analysis).
 "[T]he test for determining whether land is Indian country does not turn upon whether that land is denominated "trust land" or "reservation." Rather, we ask whether the area has been "`validly set apart for the use of the Indians as such, under the superintendence of the Government.'"
 Citizen Band Potawatomi Indian Tribe, 498 U.S. at 511
(quoting United States v. John, 437 U.S. 634, 648-49
(1978)); see Sac and Fox, 113 S.Ct. at 1991; Cohen's Handbook of Federal Indian Law 34 ("[T]he intent of Congress, as elucidated by [Supreme Court decisions], was to designate as Indian country all lands set aside by whatever means for the residence of tribal Indians under federal protection, together with trust and restricted Indian allotments."). Indeed, the Tenth Circuit regards this factor as a sufficient measure of whether land is Indian country. See Buzzard, 992 F.2d at 1076 (noting the existence of Section(s) 1151, but applying only the "set apart for the use of Indians" test in determining whether land was Indian country).
 "The district court found that the housing site met this factor's criteria.
 "Although the United States does not hold title to the land and did not vest control over it in the Tribe, CT Page 9349 HUD has, in a manner of speaking, set the land apart for occupancy by elderly and low-income members pursuant to a need recognized both by HUD and the Tribe.
 "Narragansett I, 878 F. Supp. at 356. For the reasons discussed below, we disagree.
 "Our first question must be what constitutes setting land apart. As with the concept of dependent Indian communities, there is no established definition. Having surveyed the case law, however, we agree with the Tenth Circuit's suggestion that "land is `validly set apart for the use of Indians as such' only if the federal government takes some action indicating that the land is designated for use by Indians." Buzzard, 992 F.2d at 1076 (quoting Citizen Band Potawatomi Indian Tribe, 498 U.S. at 649 (quoting John, 437 U.S. at 649)). In other words, "[s]uperintendence by the federal government, and the consequential political dependence on the part of the tribe, exists for purposes of section 1151(b) where the degree of congressional and executive control over the tribe is so pervasive as to evidence an intention that the federal government, not the state, be the dominant political institution in the area." Native Village of Venetie, 1995 WL 462232, at *14. We do not find evidence of such control here.
 "Were the land placed in trust with the United States, this factor would have been met. Taking land in trust is a considered evaluation and acceptance of responsibility indicative that the federal government has `set aside' the lands. Narragansett Indian Tribe v. Narragansett Electric Co., 89 F.3d 908, 919-920 (1 Cir. 1996).
The First Circuit found that the land's being held privately by the Tribe and not in federal trust was important to its conclusion that the land had not been "set apart by the federal government for the use, occupancy, and protection of dependent Indian peoples."
The defendant has not shown the federal government has taken action indicating that the land is designated for use by Indians. CT Page 9350 Absent such a showing, there cannot be a finding that the "claimed dependent Indian community" is a dependent Indian community under Narragansett Indian Tribe v. NarragansettElectric Co., 89 F.3d 908 (1 Cir. 1996).
 United States v. Martine 442 F.2d 1022 (10 Cir. 1971)
This oft-quoted case is one of the earliest cases on the "dependent Indian community" concept of 18 U.S.C. § 1751. It involved an involuntary manslaughter conviction under 18 U.S.C. § 1853. Defendant was a Navajo Indian. "Jurisdiction . . . rest[ed] on the claim that the area in question [was] a dependent Indian community." 442 F.2d @ 1023. Defendant claimed the place of the crime was not a dependent Indian community." The crime occurred "in an area known as the Ramah community and on land owned by the Navaho Tribe, it having been purchased with tribal funds from a corporate owner." Id. No facts regarding the area were given in the decision. The district court had evidence from law enforcement officers and BIA officials to support its finding that the area was a dependent Indian community. What that evidence was and what subordinate findings of the district court were is not set forth in Martine.
The Court indicated, that the "manner in which the [area and its people] had been treated by legislative and executive agencies" should be considered. The proper approach to the question of a dependent Indian community was to examine
 "the nature of area in question, the relationship of the inhabitants of the area to Indian Tribes and to the federal government, and the established practice of government agencies to the area." Martine, 1023.
The court made clear that merely having a group of Indians living in an area would not make it a dependent Indian community.
 "Appellant urges that such a holding implies that wherever a group of Indians is found, e.g., in Los Angeles, there is a dependent Indian community. This does not follow. The test we are applying is not so simple. Only after considering all of the various factors we have noted, as well as any other relevant factors, can the trial court determine the status of a particular area. The mere presence of a group of CT Page 9351 Indians in a particular area would undoubtedly not suffice." Martine, 1024.
The court held that the area in question was a dependent Indian community.
In the present case, the evidence supports no more than a finding that a group of Mashantucket Pequots live in the "claimed dependent Indian community."
 United States v. State of South Dakota 665 F.2d 837 (8 Cir. 1981)
This case has been the principal case cited for delineating the factors for what is or is not a "dependent Indian community."
 "The law underlying the concept of `dependent Indian community' was discussed by this court last year in Weddell v. Meierhenry, 636 F.2d 211 (8th Cir. 1980), cert. denied, ___ U.S. ___, 101 S.Ct. 2024, 68 L.Ed.2d 329 (1981), and need not be repeated at length here. In Weddell we concluded that whether a particular geographical area is a dependent Indian community depends on a consideration of several factors. These include: (1) whether the United States has retained `title to the lands which it permits the Indians to occupy' and `authority to enact regulations and protective laws respecting this territory,' 636 F.2d at 212, citing United States v. McGowan, 302 U.S. 535, 539, 58 S.Ct. 286, 288, 82 L.Ed. 410 (1938); (2) `the nature of the area in question, the relationship of the inhabitants of the area to Indian tribes and to the federal government, and the established practice of government agencies toward the area,' 636 F.2d at 212, citing United States v. Martine, 442 F.2d 1022, 1023
(10th 1971); (3) whether there is `an element of cohesiveness . . . manifested either by economic pursuits in the area, common interests, or needs of the inhabitants as supplied by that locality,' 636 F.2d at 212-13, citing United States v. Morgan, 614 F.2d 166, 170 (8th Cir. 1980); and (4) `whether such lands have been set apart for the use, occupancy and protection of dependent Indian peoples,' 636 F.2d at 213, citing United States v. Mound, 477 F. Sup. 156, 158 (D.S.D. 1979), citing Youngbear v. Brewer, 415 F. Sup. 807, 809
CT Page 9352 (N.D.Iowa 1976), aff'd, 549 F.2d 74 (8th Cir. 1977)." United States v. State of South Dakota, 665 F.2d 837, 839 (8 Cir. 1981), cert. denied, 459 U.S. 823 (1982).
 South Dakota involves a Indian housing project within the City of Sisseton. The site had been a part of an Indian reservation which was terminated in 1891. Eventually, a church acquired the project site. The church conveyed the site to the United States in trust for the Sisseton-Wahpeton Sioux Tribe in 1969. The deed provided that the land was to be used for low rent housing; if not so used within five years, the land would revert to the grantor. The project was built with HUD funds. Members of the project's governing board are appointed by the Tribe's Council. Most, but not all, of the tenants are Tribe members. The Tribe provides many services to and programs for the tenants. Many of these are administered in cooperation with the federal government through the BIA and the Indian Health Service (IHS). The IHS arranged with the City for water and sewer facilities for the project, and provided a garbage truck for the project and the rest of the City. The IHS maintains a hospital in the City for Tribal members including those in the project. All BIA programs on the Sisseton-Wahpeton Reservation are open to the Tribal members who live in the project. The BIA has done road work in the project in cooperation with the City. The HUD Office of Indian Affairs makes an annual payment to support the project to make up for its inability to collect enough rent. Engineering and architectural services are available through the Office of Indian Housing.
HUD makes payments to the City for municipal services rendered to the project. This includes snow removal, some street and sidewalk repair, and some traffic control signs. Fire protection is provided by the City on a per-visit fee charged to the Housing Authority. The children from the project attend the City's schools; the City high school was built by the BIA on land under its jurisdiction.
The district court concluded the housing project was a dependent Indian community.
Because it had not been raised in the trial court, the Court of Appeals did not consider whether the entire City, rather than the project site alone, was the "proper community of reference."
The Court of Appeals upheld the district court's holding that CT Page 9353 the housing project was a dependent Indian community.
The defendant has not introduced any evidence that comes close to showing the factors recounted in South Dakota have been met.
 Yukon Flats School District v. Venetie Tribal Government 101 F.3d 1286 (9 Cir. 1996)[17]
This case involves an Alaskan Native tribe's taxing a contractor hired by the State of Alaska to build a school in a tribal village. The State of Alaska claimed the Tribe had no authority to tax its contractor. The Tribe claimed it could tax the contractor because the school was in Indian country, i.e., a dependent Indian community. The case also entails construction of the Alaska Native Claims Settlement Act (ANCSA), 43 U.S.C. § 1601
et seq.
ANCSA revoked the various reserves which had been set aside for Alaska's Natives. It abolished all claims "based on claims of aboriginal right, title, use, or occupancy of land . . . or based on any statute or treaty . . .." 43 U.S.C. § 1603 (c). Pursuant to the Act, $962.5 million and 44 million acres were to be transferred to Native village and regional corporations established by ANCSA. The shareholders of each corporation were the Natives living in the corporation's geographical area. ANCSA permitted a village corporation to opt out of ANCSA and acquire title to "any reserve [previously] set aside for the use or benefit of its shareholders." In exchange, the village corporation gave up any claim to any other lands or funds which were available under ANCSA.
The Neets'aii Gwich'in is a group of Alaskan Natives. The Native Village of Venetie is the governing body of the Neets'aii Gwich'in. In 1943, a reservation had been set aside for the Neets'aii Gwich'in. ANCSA abolished that reservation. The Neets'aii Gwich'in opted out of ANCSA. The United States transferred the 1.8 million acres which had been the reservation to the two village corporations set up for the Neets'aii Gwich'in. The two Neets'aii Gwich'in village corporations transferred fee simple title to the Native Village of Venetie, the governing body. The Neets'aii Gwich'in shareholders of the two village corporations then voted to dissolve the corporations created by ANCSA. CT Page 9354
The district court held the Venetie (Neets'aii Gwich'in) was a tribe. That court also held that with the passage of ANCSA, Venetie was no longer a dependent Indian community. The district court held that ANCSA abolished Indian country in Alaska.
The Ninth Circuit detailed the factors for determining whether a particular land area is a dependent Indian community.
 "The ultimate question presented by this case — whether Venetie has the authority to tax activities occurring within its territory — turns on whether Venetie occupies Indian country. Venetie I, 856 F.2d at 1390. To resolve this question, we must first establish the proper standard for determining whether Indian country exists in a given case.
* * *
 Thus, we must establish the test for determining whether a tribe constitutes a dependent Indian community within the meaning of § 1151(b).
 "Although the Supreme Court has never resolved this narrow question, we do not write on a blank slate. A clear body of Court precedent emphasizes two central features of the inquiry into whether a given area constitutes Indian country, as a general matter: first, whether the territory is "validly set apart for the use of the Indians as such," and second, whether the Natives who inhabit it are "under the superintendence of the [federal] Government." [Citations omitted.]
* * *
 "Relying upon South Dakota and Martine, we have suggested that an inquiry into whether a Native group qualifies as a dependent Indian community requires an analysis of six factors:
 "(1) the nature of the area; (2) the relationship of the area inhabitants to Indian tribes and the federal government; and, (3) the established practice of government agencies toward that area; . . . . ([4]) the degree of federal ownership of and CT Page 9355 control over the area; ([5]) the degree of cohesiveness of the area inhabitants; and ([6]) the extent to which the area was set aside for the use, occupancy, and protection of dependent Indian peoples.
 Venetie I, 856 F.2d at 1391. The only significant difference between our suggested inquiry and the test adopted by the First, Eighth, and Tenth Circuits is that we assess the "degree of federal ownership and control" over the area in question while the other circuits ask whether the United States retains "title" to the land in question." Yukon Flats School District v. Venetie Tribal Government, 101 F.3d 1286, 1290-1292
(9 Cir. 1996).
The Ninth Circuit emphasized that —
 "a federal set aside and federal superintendence are the dominant factors of the dependent Indian community calculus." Id, @ 1292. See also 1293 and 1294.
 "In sum, we hold that a dependent Indian community requires a showing of federal set aside and federal superintendence. These requirements are to be broadly construed and should be informed in the particular case by a consideration of the following factors:
 (1) the nature of the area; (2) the relationship of the area inhabitants to Indian tribes and the federal government; (3) the established practice of government agencies toward that area; (4) the degree of federal ownership of and control over the area; (5) the degree of cohesiveness of the area inhabitants; and (6) the extent to which the area was set aside for the use, occupancy, and protection of dependent Indian peoples."
The Ninth Circuit held that ANCSA had not extinguished Indian country in Alaska. 101 F.3d at 1300. The Court analyzed the attributes of the ANCSA created corporations against the factors quoted above. The Ninth Circuit concluded that the Native Village of Venetie was a dependent Indian community. CT Page 9356
ANCSA is unique. Little would be accomplished in recounting the Ninth Circuit's analysis of ANCSA's nuances and the reasoning that produced the conclusion that the Native Village of Venetie is a dependent Indian community. The Ninth Circuit set forth the factors for determining whether particular land was a dependent Indian community which had been developed by various courts. This court used that detailed enumeration in determining whether the "claimed dependent Indian community" was a dependent Indian community.
 Is There A Community?
Before analyzing the "claimed dependent Indian community" in light of the six factors just mentioned, a basic question must be addressed: Is there is a "community?" This question has been addressed judicially.
 "The case law reveals at least two organizing principles useful for determining the community of reference. The first is the status of the area in question as a community. Several courts have applied the definition of community originally used in Berry v. Arapahoe Shoshone Tribes, 420 F. Sup. 934 (D.Wyo. 1976). Blatchford, 904 F.2d at 546; Morgan, 614 F.2d at 169-70. The Berry court turned to a dictionary definition of community to inform its analysis: "Webster's New Collegiate Dictionary, (1975) defines a community as `a unified body of individuals . . . with common interests living in a particular area; . . . an interacting population of various kinds of individuals in a common location.'" Berry, 420 F. Supp. at 940. * * * * In Morgan, the court also discussed what constituted a community.
 Basic to the definitions of "community" which we have reviewed is the existence of an element of cohesiveness. This apparently can be manifested either by economic pursuits in the area, common interests, or needs of the inhabitants as supplied by that locality. Cohesiveness or common interests can be more necessary to the existence of a community than can mere density of population.
 Morgan, 614 F.2d at 170. CT Page 9357
 "* * * The common and ordinary meaning of community, however, connotes something more than a purely economic concern. A community is a mini-society consisting of personal residences and an infrastructure potentially including religious and cultural institutions, schools, emergency services, public utilities, groceries, shops, restaurants, and the other needs, necessities, and wants of modern life. See, e.g., Berry, 420 F. Supp. at 940; Blatchford, 904 F.2d at 548-49." [Footnotes omitted.] Pittsburgh Midway Coal Mining Company v. Watchman, 52 F.3d 1531, 1543-44
(10 Cir. 1995).
The "claimed dependent Indian community" does not meet any of the criteria outlined by the case law for a "community." It is a place to live. There is no evidence it has an infrastructure of its own. There is no evidence of any interacting or cohesiveness among its residents. The residents have an understandable adhesion to the Tribe and the Reservation; there is no evidence of any drawing together of the residents for any type of activity. There is no internal union of its residents. The needs of its residents, except for housing, are not met or furnished by or from within the "claimed dependent Indian community." See pp. 18-21, above.
The court could not find there was a community.
 IS THE "CLAIMED DEPENDENT INDIAN COMMUNITY" A DEPENDENT INDIAN COMMUNITY?
The court analyzed Venetie's six factors to determine if there had been a federal set aside and federal superintendence.
 (1) The nature of the area
The area is small, only 30-40 acres. It is zoned single family. There were only some 21 homes on separate lots. Four were owned by non-Indians. Seventeen were owned by the Tribe. The residential properties were bought by the Tribe in the early 1990's. The seventeen houses owned by the Tribe are occupied by adult Tribe members and their families. There are no external indications that most of the inhabitants are Mashantucket Pequots or that the area has an Indian character. The evidence shows a residential neighborhood on Coachman Pike. The prices paid for CT Page 9358 the properties indicate the properties are at the least on the upscale side. There is no evidence the federal government has any connection with the area.
It is within the settlement lands.
The area in question is near the Reservation. It has no stores or commercial establishments. There is no evidence that anyone other than the defendant ever thought of or envisioned it as a dependent Indian community before the motion at bar was conceived.
 (2) The relationship of the area inhabitants to Indian tribes and the federal government
Most, but not all, of the inhabitants are members of the Mashantucket Pequot Tribe. The adult Tribe members by and large work for the Tribe or a Tribe enterprise on the Tribe's nearby Reservation. The Tribe members are financially dependent on the Tribe. They are also entitled to various Tribe furnished health, social, and educational benefits.
Except for their being members of the federally recognized Tribe, there is no evidence of any relationship or dependence on the federal government arising from their living in the "claimed dependent Indian community."
 (3) The established practice of government agencies to that area
The State of Connecticut and the Town of Ledyard render services to the area and require compliance by the residents of the "claimed dependent Indian community" the same as any other place in Ledyard.
There is no evidence of any federal involvement in or with respect to the "claimed dependent Indian community."
 (4) The degree of federal ownership of and control over the area
None. CT Page 9359
 (5) The degree of cohesiveness of the area inhabitants
There is no evidence of any cohesiveness between or among the people living in the several households in the "claimed dependent Indian community." While many are Tribe members, there is no showing of cohesiveness related to or arising from their living in the "claimed dependent Indian community" as distinguished from that arising from Tribal membership.
 (6) The extent to which the area was set aside for the use, occupancy, and protection of dependent Indian peoples
None. The federal government has never taken any action with respect to the "claimed dependent Indian community." Although there is evidence the Tribe has requested the United States to take at least parts of the "claimed dependent Indian community" into federal trust for the Tribe, the United States had not done so. The federal government did not own any of the land in the "claimed dependent Indian community."
There is no evidence that the federal government has ever taken any action indicating it has control of the area.
The fact that the United States has not taken the land into trust, although requested to do so, is telling. It is compelling evidence that the United States does not consider the area as "validly set apart for the use of the Indians as such," or that its Indian inhabitants are "under the superintendence of the [federal] Government." State of Alaska v. Native Village ofVenetie Tribal Government, 101 F.3d 1286, 1291 (9 Cir. 1996).
The court could not find the "claimed dependent Indian community" was dependent Indian community under the analysis prescribed by the Ninth Circuit in Venetie.
 INDIAN COUNTRY AND THE DEPARTMENT OF REVENUE SERVICE
In an attempt to show that the "claimed dependent Indian community" was a dependent Indian community, the defendant presented evidence regarding the treatment of defendant's mother's income by the Connecticut Department of Revenue CT Page 9360 Services. The action of the Department is curious and disturbing.
A regulation of the Department provides:
 12-702(c)(1)-3. Enrolled member of federally recognized tribe
 "(a) In general. Income of an enrolled member of a federally recognized tribe is exempt from Connecticut income tax as long as the member (i) resides in Indian country and (ii) only has income that is derived from or connected with sources within Indian country. Income of an enrolled member of a federally recognized tribe is subject to Connecticut income tax in the same manner as if the person were not an enrolled member if the member does not reside in Indian country. See McClanahan v. State Tax Commission, 411 U.S. 164
(1973), White Mountain Apache Tribe v. Bracket; 448 U.S. 136 (1980) and Oklahoma Tax Commission v. Sac and Fox Nation, 508 U.S. ___, 124 L.Ed.2d 30 (1993)." Conn. Dept. Reg. 12-702 (c)(1)-3.
Another regulation provided that Indian Country was defined by 18 U.S.C. § 1751. Conn. Dept. Reg. 12-702 (c)(1)-3(g).
The statutory scheme for the adoption of departmental regulations contemplates specific statutory authority for each regulation. See, e.g., C.G.S. §§ 12-2 (a)(2), 4-168 (a) and (g). There is no statutory authority for these regulations. While these regulations are consistent with federal law, the court is not aware of any authority for the adoption of such regulations without the General Assembly's authorization. An accountant advised defendant's mother of the exemption allowed by the regulation.
 "As an enrolled member of the Mashantucket Pequot Tribe, you are not required to pay State of Connecticut Income Tax on your earnings from the Tribe, if you reside in `Indian Country.' `Indian Country' is defined in 18 U.S.C. § 1751. Under the provisions of the Section, it is clear that Indian Country can include Indian communities outside the borders of the official reservation." Exhibit 4.
Amended returns for the tax years 1994 and 1995 were prepared CT Page 9361 by the accountant for defendant's mother seeking refunds of the income tax she had paid the State for those years. In the cover letter to defendant's mother enclosing the amended return for 1995, the accountant specifically stated:
 "This return is amended under the assumption that the Department of Revenue Services will not challenge the definition of `Indian Country.' As a precaution, we suggest you do not reduce your current Connecticut withholding on payments from the Tribe until the Connecticut Department of Revenue Services rules on the definition of `Indian Country.'" Exhibit 4.
The amended return stated in part:
 "Taxpayer is a member of the Mashantucket Pequot Tribe. Return is being amended to determine the tax in accordance with Section 12-702 (c)(1)-3. "The Taxpayer does not live on the reservation but does live on real estate owned by the Tribe and administered by the Tribal Housing Authority and is located close to the reservation. The taxpayer believes this residence falls within `Indian Country' as defined by 18 U.S.C. § 1151." Exhibit 4.
Defendant's mother did not state in her amended return that she claimed she lived in a "dependent Indian community." She only claimed she believes this residence falls within "Indian country." Nor did her accountant indicate that she may live in a "dependent Indian community." The accountant only advised that she file an amended return seeking a refund wherein she make the statement she believed she lived in "Indian country." The not-too-subtle import of that advice was that she probably would get away with a refund based on "the assumption that the Connecticut Department of Revenue Service will not challenge the definition of `Indian country.'" Exhibit 4.
The amended return for 1995 requested a refund of $14,941. The refund was approved and paid. Exhibit 4.[18]
There is no evidence the Department made any attempt to verify the claims made by the defendant's mother in her amended return. There was no evidence the Department of Revenue Services verified defendant's mother's claim that she was (1) an enrolled member of a federally recognized tribe, the Mashantucket Pequot CT Page 9362 Tribe, (2) her income was derived from the tribe, and/or (3) 67 Coachman Pike where she claimed to live was in "Indian Country." There was no evidence the Department made a determination that 67 Coachman Pike, Ledyard was in a "dependent Indian community."
In fact, the evidence is that the Department did not make any such determination. Tr. 31, 42. An attorney employed by the Department of Revenue Services, Frederick Clark, was called to testify for the defendant. He stated several times that the tax reporting system, including refunds, "is generally a self assessing system." Information on a return re tribal membership, the tribe as the source of the income, and the claim of "Indian country" are not routinely checked by the Department.[19] The Department has not treated 67 Coachman Pike as being within a dependent Indian community. The issuance of the refund of nearly $15,000 was not such a determination. Tr. 35. This is consistent with the accountant's "assumption that the Department of Revenue Services will not challenge the definition of `Indian Country.'"
The court found that the Connecticut Department of Revenue Services had not made any ruling, finding, or determination that 67 Coachman Pike, Ledyard, is located within a "dependent Indian community."
 EFFECT OF TRIBE'S APPLICATION FOR TRUST STATUS ON DEPENDENT INDIAN COMMUNITY DETERMINATION
The "claimed dependent Indian community" is located within the "private settlement lands" described in the Settlement Act.25 U.S.C. § 1752 (3)(A). In approximately 1995, the Tribe applied to the BIA to have some lands within the "claimed dependent Indian community" taken into trust by the United States for the benefit of the Tribe.[20] For the purpose of this decision, the court assumed that an application for trust status was made for the entire "claimed dependent Indian community."
For reasons not clear to the court, defendant contends that these two facts somehow enhanced his claim that the "claimed dependent Indian community" is a dependent Indian community.
Any "private settlement land" taken into trust pursuant to the Settlement Act simultaneously became part of the Reservation and subject to the full criminal and civil jurisdiction of the State of Connecticut. Settlement Act, § 6, 25 U.S.C. § 1755. See also State v. Spears, 234 Conn. 78 (1994) and CharlesCT Page 9363v. Charles, 243 Conn. 255 (November 18, 1997).
The court viewed this contention as internally inconsistent. If the application for trust status were successful, the land would become Reservation, the primary form of Indian country. How an application not acted upon advanced defendant's "dependent Indian community" claim was not evident. Overall, the fact that the United States had not acted upon the Tribe's application had a negative effect upon the "dependent Indian community" claim.
The Settlement Act provided for the purchase of private settlement lands by the Secretary until January 1, 1985 with a $600,000 fund established by the Act. 25 U.S.C. § 1754 (b) (2). Any of the $600,000 not used by the Secretary for such private settlement land purchases as of January 1, 1985, was to be made available to the Tribe's economic development plan.25 U.S.C. § 1754 (b)(2). Any private settlement lands purchased under the Act immediately would become a part of the Reservation.25 U.S.C. § 1754 (b)(7).
The lands within the "claimed dependent Indian community" were purchased by the Tribe, not by the Secretary. The lands were purchased with Tribal funds, not with the funds appropriated by the Act. The amount paid for the land was obviously far higher than the Act's $600,000.[21]
The lands in the "claimed dependent Indian community" were not purchased by the Act's January 1, 1985 cutoff. Congress' authorization of only $600,000 for purchase of "private settlement lands" and the short time for such acquisition at least suggests Congress contemplated a rather limited acquisition of land for enlargement of the Reservation than that for which the Tribe has applied. If the principle of expressio unius,exclusio alterius is applicable — no reason has been advanced why it should not — then the lands of the "claimed dependent Indian community" could not be taken into trust under the authority of the Settlement Act.
 CONCLUSION
For the reasons given above, the court found that the "claimed dependent Indian community" was not a dependent Indian community, that 67 Coachman Pike was not in Indian country, and denied the defendant's Motion To Dismiss. CT Page 9364
 EPILOGUE
On February 25, 1998, the Supreme Court decided State ofAlaska v. Native Village of Venetie Tribal Government, 522 U.S. ___, 118 S.Ct. 948 (February 25, 1998). It reversed the Ninth Circuit.
The Supreme Court interpreted the term "dependent Indian community."
 "We now hold that it refers to a limited category of Indian lands that are neither reservations nor allotments, and that satisfy two requirements — first, they must have been set aside by the Federal Government for the use of the Indians as Indian land; second, they must be under federal superintendence." 118 S.Ct. @ 953.
The Supreme Court stated —
 "We therefore must conclude that in enacting § 1151(b), Congress indicated that a federal set-aside and a federal superintendence requirement must be satisfied for a finding of a "dependent Indian community" . . . These requirements are reflected in the text of § 1151(b): The federal set-aside requirement ensures that the land in question is occupied by an "Indian community"[6] the federal superintendence requirement guarantees that the Indian community is sufficiently "dependent" on the Federal Government that the Federal Government and the Indians involved, rather than the States, are to exercise primary jurisdiction over the land in question." [Two footnotes omitted.]
 "[6]. The federal set-aside requirement also reflects the fact that because Congress has plenary power over Indian affairs, see U.S. Const., Art. I, § 8, cl. 3, some explicit action by Congress (or the Executive, acting under delegated authority) must be taken to create or to recognize Indian country." State of Alaska v. Native Village of Venetie Tribal Government, 118 S.Ct. 948, 954-955 (February 25, 1998).
CT Page 9365
The court found that the "claimed dependent Indian community" is not a community. See pp. 44-45, above. "The federal set-aside requirement ensures that the land in question is occupied by an `Indian community.'" The evidence shows only that several Indians live in the area. "[T]he federal superintendence requirement guarantees that the Indian community is sufficiently `dependent' on the Federal Government that the Federal Government and the Indians involved, rather than the States, are to exercise primary jurisdiction over the land in question." [Footnote omitted.]Venetie, 118 S.Ct. @ 955. Here there is no evidence that the Federal Government has exercised any jurisdiction at all over the "claimed dependent Indian community." Nor has the Tribe. The State, and its political subdivision the Town of Ledyard, exercise not only primary, but exclusive jurisdiction over the "claimed dependent Indian community."
There is no evidence, record, or even claim that "some explicit action by Congress (or the Executive, acting under delegated authority) [has been] taken to create or to recognize [the `claimed dependent Indian community'] as Indian country," i.e., a dependent Indian community.
It is quite clear that the defendant has not shown that 67 Coachman Pike, Ledyard, Connecticut, was located in a dependent Indian community as required by the now definitive holding ofState of Alaska v. Native Village of Venetie Tribal Government,522 U.S. 118 S.Ct. 948 (February 25, 1998).
Parker, J.
c:\reels\decision